## Alicia MINTON v.
## ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 00-544         34 S.W.3d 776

Court of Appeals of Arkansas
Division II
Opinion delivered December 20, 2000

*Nicole L.Baker*, Deputy Public Defender, for appellant.

*Kathy L. Hall*, for appellee.

ANDREE LAYTON ROAF, Judge. Alicia Minton appeals a Benton County Chancery Court decree that terminated her parental rights in her daughter M.M, a two-year-old child who had been taken into and remained in the custody of the Department of Human Services (DHS) since shortly after she was born. Minton argues that the court erred in finding that DHS proved by

clear and convincing evidence that her parental rights should be terminated. We reverse.

M.M. was born prematurely on December 2, 1997, at St. Mary's Hospital in Rogers and was immediately transferred to Arkansas Children's Hospital in Little Rock, where she remained for approximately two months. On February 6, 1998, DHS filed a petition for emergency custody, alleging that M.M. was dependent neglected. Attached to the petition was an affidavit stating that Minton had admitted to a DHS employee that the baby was unwanted and that she had used drugs extensively during her pregnancy in an effort to abort the child; Minton had visited the child at the hospital only once despite an offer of Medicaid transportation assistance; Minton refused to go to the hospital and "live-in" for three days and learn how to care for M.M. after discharge; and Minton failed to even contact the hospital regarding instruction on how to care for M.M.'s special medical needs. Probable cause was found to place M.M. in DHS custody.

Pursuant to a March 31, 1998, adjudication hearing, the chancellor found that Minton had failed to make arrangements to pick up M.M. from the hospital, had little contact with M.M. while she was hospitalized in Little Rock, had not learned how to care for M.M.'s special medical needs, and had used drugs while she was pregnant with M.M. The chancellor ordered Minton to attend all of M.M.'s medical appointments, obtain stable housing and employment and housing, visit M.M., obtain a drug and alcohol assessment, attend parenting classes, and pay $25 per week child support.

Minton had made little progress by the time that a permanency planning hearing was held on March 23, 1999. Subsequently, based on Minton's failure to comply with the case plan, DHS petitioned for termination of her parental rights, alleging that M.M. had remained outside of Minton's home for a period in excess of twelve months and that Minton had willfully failed to provide significant material support in accordance with her means and had failed to maintain meaningful contact with M.M. The petition also alleged that despite offers of appropriate family services, Minton had failed to correct the conditions which caused removal and that reunification was contrary to M.M.'s health, safety, or welfare.

At the June 1, 1999, termination hearing, DHS presented testimony concerning the history of the case and Minton's failure to comply with the case plan. However, DHS employees also testified that since the March 23, 1999, permanency planing hearing, Minton had obtained the required alcohol and drug assessment, begun attending visitation on a regular basis, attended twelve of fifteen of M.M.'s scheduled therapy appointments and medical appointments, and secured stable employment. Minton had not, however, attended parenting classes, maintained a stable residence, or paid child support.

At the conclusion of the hearing, the chancellor found that DHS did not have an appropriate Permanency Placement Plan in place, and therefore, he was precluded by statute from considering the parental-rights-termination petition. Nonetheless, the chancellor found that there was sufficient clear and convincing evidence to terminate Minton's parental rights in that she "failed to materially support the child; she's failed to attend the child, and take care of its basic needs." The chancellor then stated that he would "abate" a termination order pending the filing of an appropriate Permanency Placement Plan with the court, and he continued the case for ninety days. The chancellor also ordered DHS to continue reunification efforts, correct problems with DHS's telephone system so that Minton would have a dependable way of contacting DHS, and make a determination of whether M.M. had bonded with Minton. Minton was ordered to stay in contact with DHS and make as many of M.M.'s medical appointments as possible. Addressing Minton, the chancellor stated:

> Ms. Minton, I just have to say to you, just as clearly as I can, that I have entered an Order Terminating your Parental Rights. But I am abating that Order. Not because you have shown me an exemplary change in your circumstances, over the last six or eight months, but mostly because I don't believe the Department has established a sufficient Permanency Plan for this child. And that gives you the opportunity to show me that, in fact, I should never enter the Termination Order. So you're on a short rope, ma'am. The way to get from where you are to where you need to be is very short, and it's going to take some hard work to get there. And it's going to take some sacrifices. I don't know wether you can do those, or not. I'm not sure whether any single married mother who started out in a hole as deep as the one you were in, can get there. But I

> believe that under the circumstances, this is what the law provides. And so that is the Ruling of this court.

After the judge completed his ruling, DHS asserted that they had an adoptive home interested in M.M., although the family had never met her, and asked the court if it wanted them to pursue placement with this family during the ninety-day abatement. The chancellor replied:

> I am just saying that you have to have a specific plan. How you execute it, what steps you take, how far down that plan you get, this law doesn't talk about that. It talks about a specific plan for permanency. So if you have that at some point, then we'll come back. In many ways, this ruling today merely delays the inevitable decision that's going to have to be made.

The foregoing ruling apparently was interpreted differently by the parties. Minton understandably believed that she had been given an opportunity to demonstrate that she could comply with the case plan and ultimately secure custody of M.M. DHS, however, acted as though it had been given the authority and direction to move ahead with placement of M.M. in a permanent adoptive home.

DHS promptly moved M.M. from the therapeutic foster home she was in into a permanent adoptive home, and filed a motion to lift the abatement. On July 19, 1999, the chancellor signed an order lifting the abatement, then reinstated it after an August 30, 1999, hearing in which he admitted that he had lifted the abatement without reviewing the abated order.

One week later, on September 7, 1999, the review hearing that had been scheduled pursuant to the abated order was held. DHS employee Leann Spruell testified that when the abatement was lifted, she attempted to schedule Minton for a "last visit" with M.M., and Minton became furious. However, when the abatement was reinstated DHS resumed services. Spruell admitted that Minton had secured an apartment, a steady job, had attended parenting classes, had not tested positive for drugs, and in short stated that "everything has been done as far as complying with the case plan."

Darlene Vinyard, the adoption specialist from DHS, testified that M.M. was adjusting well to her new adoptive home and stated that the family was willing to adopt M.M. as soon as the six-month waiting period was complete. Vinyard also stated that she observed

three of Minton's visits with M.M., which seemed to be "pleasant," but she expressed concerns with Minton's expectations for M.M. in light of the child's developmental delays and the inadequacy of Minton's "support system." Chris Rodriguez, a DHS probationary trainee, testified and was critical of Minton's parenting skills based on her observations of a single visit.

Minton testified that she had complied with the case plan in every respect and continued to attend visits and medical appointments even though it required that she be away from her job. Minton claimed that she had not been informed about the abatement being lifted, and her visitations had been disrupted by DHS. Minton asserted that she had bonded with M.M., that she would be able to manage working and caring for both M.M. and her other child, and that she was retiring her court fines and consequently expected to be able to get her driver's license back in the near future.

At the conclusion of the hearing, M.M.'s attorney ad litem noted that Minton had complied with the case plan and stated that he believed that Minton was sincere. He then moved that the court allow reunification. The chancellor noted how much progress Minton had made and decided to "further abate" the termination order. He then ordered DHS to begin a plan immediately to reintegrate M.M. into Minton's home, within sixty days, with increased visitation and "more and more efforts . . . made to make sure that Alicia Minton is capable of caring and tending to this child, while this process continues." The chancellor again admonished Minton that M.M. remained in DHS custody and that "the Order of Termination has not been set aside [but] merely abated." He then set a review hearing for December 7, 1999, ordered DHS to provide "intensive services to reunify this child with the mother within sixty days, and thereafter, have a thirty-day trial placement, if appropriate."

On November 15, 1999, however, a hearing was granted pursuant to a motion filed by Minton because the trial placement, ordered in the September 7 hearing, had not taken place. M.M.'s attorney ad litem confirmed that trial placement had not taken place and recommended that the court order the trial placement to begin. The prospective adoptive parents also appeared at the hearing with an attorney and moved to intervene in the case. While the

chancellor denied their intervention motion, he allowed their attorney to participate in the hearing.

Minton testified about DHS's interference with her reunification efforts, including objecting to her using the Jones Center for parenting classes, canceling or interrupting scheduled visits with M.M., and preventing her overnight visitation by having her arrested for an outstanding traffic warrant on the day of her first scheduled overnight visit, and aborting the second scheduled overnight visit because criminal-record investigation forms had not been completed by friends and family and because a guest was present in her home.

DHS employees admitted to making the call that resulted in Minton's arrest, denied disapproving the parenting classes, and opined that Minton had not made "any progress" in self-sufficiency because she had an enormous amount of debt. However, they "applauded" Minton's having kicked her drug habit and securing a residence and steady employment. DHS admitted removing M.M. from Minton's home because a guest was present and testified that Minton had allowed M.M., who had a history of respiratory problems, to be around smoke because they observed a guest at a birthday party at Minton's home smoking outside and smoke was "drifting" toward the child. M.M.'s foster mother testified that Minton had approximately forty visits with M.M. since she was placed in her home and that M.M. seemed insecure after the visits. However, she admitted that it took M.M. several weeks to "settle down" after being placed in her home.

The chancellor ruled from the bench he was persuaded that DHS had interfered with the placement of M.M. with Minton. He stated that he wanted a determination of whether or not M.M. "is capable of being re-bonded with her mother," and that was not provided. He ordered DHS to, within the next five days, provide a case worker that had not been associated with the case, who would be supervised by someone who also was not associated with the case. The attorney ad litem recommended that the trial placement begin, and the chancellor ordered that Minton get the necessary paperwork submitted for day care vouchers and Medicaid coverage.

The next hearing in this case was held a month later, on December 20, 1999, in which the issue to be determined was

whether Minton had shown that she bonded with M.M. and if not, whether she was likely to be bonded at any time in the near future. DHS employees, who observed Minton's visits and the single over-night visit with M.M. during the period, in essence testified that during the visits, M.M. behaved as if she wanted to leave, said the word "go," came to them, clung to their legs, and cried for "Mommy and Daddy" when she became tired. They acknowl-edged that they had failed to complete the bonding assessment in part because the DHS employee responsible for arranging the assessment had been on vacation for a week. Minton testified that M.M. comes to her, calls her "Mommy," and denied that there were any problems with the visits. Regarding the bonding assess-ment, Minton stated that she had difficulty in making an appoint-ment because she could not afford to miss any more work. At the close of the testimony, the chancellor announced that it was his conclusion that Minton had not bonded with M.M. and vice versa. He found that the best interests of M.M. dictated that Minton's parental rights be terminated and that M.M. be freed for adoption. Minton appeals from this decision.

On appeal, Minton argues that the trial court erred by ruling that DHS proved by clear and convincing evidence that her parental rights to M.M. should be terminated. Minton asserts that pursuant to Ark. Code Ann. § 9-27-341 (Repl. 1999), there were two grounds applicable to her case that would justify termination of her parental rights: her failure to correct the conditions that caused the removal despite a meaningful effort by DHS to rehabilitate the home, and her failure to provide significant material support in accordance with her means. She contends that the chancellor erred in finding clear and convincing evidence to support either ground.

Regarding her failure to correct the conditions that caused the removal of M.M. from her custody, she argues that the chancellor erred in entering an order terminating her parental rights because she had met and continued to meet the "various and ever-changing requirements" placed on her by DHS, and because he found that DHS had deliberately interfered with his September 7, 1999, order directing DHS to implement a plan to reunify her with her child. She concedes that she made "little progress" toward meeting the requirements for reunification during the first several months of the case; however, she asserts that in February of 1999 she began to demonstrate her commitment to reunification by securing a stable

residence, maintaining regular employment, completing a drug and alcohol assessment, submitting to random drug screens, attending most of M.M.'s physical therapy sessions and medical appointments, cooperating in taking parenting classes, and consistently exercising her visitation. Accordingly, she contends that DHS did not meet its burden of proving by clear and convincing evidence that despite a meaningful effort by DHS to rehabilitate her home and correct those conditions which caused removal, the conditions had not been remedied. Further, citing Ark. Code Ann. § 9-27-341(a), she argues that termination of parental rights should be used only when the evidence shows that the child could not be returned to the parent within a reasonable period of time, and the evidence showed that she had taken steps to have M.M. returned to her in a short amount of time. She contends that one of the only barriers was her lack of transportation for medical appointments, and she was remedying that situation. Minton asserts that as of the termination hearing, M.M. had not been placed in an adoptive home and that a DHS worker testified that any potential adoptive home would require a slow integration process before M.M. could be placed there.

Minton argues further that, subsequent to the termination hearing, the actions of DHS call into question their intention to provide "meaningful" efforts at reunifying her with her daughter. She notes that DHS discontinued rehabilitative services shortly after it filed its motion to reconsider that resulted in the chancellor lifting his abatement of the termination order, a motion that the chancellor stated "clearly was not an accurate statement of the case." Moreover, Minton contends that, in September, DHS essentially prevented her two scheduled overnight visits, and the court actually found that DHS had interfered with the placement. She argues that the observations of the DHS personnel regarding how M.M. responded to her does not constitute clear and convincing evidence that she and M.M. had not bonded because DHS denied her the trial placement she needed in order to establish the bond.

Regarding the second possible ground for termination, her willful failure to provide significant material support in accordance with her means, which she acknowledges was cited by the termination order, Minton notes that Ark. Code Ann. § 9-27-341(b)(2)(B), the applicable subsection of the statute setting forth this ground also requires the failure to "maintain meaningful contact" with her

child. She urges this court to read this subsection as not setting forth alternative grounds but rather a two-prong requirement. Minton contends that was the approach taken by the supreme court in *Crawford v. Arkansas Dep't of Hum. Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997), when it considered the two parts of the subsection together. She contends that otherwise, a parent in a dependency-neglect case could see her parental rights terminated simply because of her poverty. Minton also argues that while she did not pay the court-ordered support, she did bring M.M. gifts and clothes, and she maintained a residence where M.M. could live and made payments on her court fines so that she could provide transportation for her daughter. She also stated that she was paying support for two children in Arizona and for much of the case, her financial situation was "dire." We find these arguments persuasive.

■ Any party seeking to terminate the parental relationship bears the heavy burden to prove by clear and convincing evidence that the parent has significantly and without just cause failed to communicate with or support the child as required by law or decree. *Bush v. Dietz,* 284 Ark. 191, 680 S.W.2d 704 (1984) (decision under prior law). Adoption proceedings are in derogation of the natural rights of parents, and statutes permitting such are to be construed in a light favoring continuation of the rights of natural parents. *Id.*

■ In pertinent part, Ark. Code Ann. § 9-27-341 provides for termination of parental rights on one or more of the following grounds:

> (A) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent. It is not necessary that the twelve-month period referenced in this subdivision (b)(2)(A) immediately precede the filing of the petition for termination of parental rights, or that it be for twelve (12) consecutive months;

> (B) The juvenile has lived outside the home of the parent for a period of twelve (12) months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile. To find willful failure to maintain meaningful contact, it must

be shown that the parent was not prevented from visiting or having contact with the juvenile by the juvenile's custodian or any other person, taking into consideration the distance of the juvenile's placement from the parent's home. Material support consists of either financial contributions or food, shelter, clothing, or other necessities where such contribution has been requested by the juvenile's custodian or ordered by a court of competent jurisdiction. It is not necessary that the twelve-month period referenced in this subdivision (b)(2)(B) immediately precede the filing of the petition for termination of parental rights, or that it be for twelve (12) consecutive months;

When the burden of proving a disputed fact in chancery court is by clear and convincing evidence, the inquiry on appeal is whether the chancery court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). Clear and convincing evidence is defined as "that degree of proof which will produce in the fact finder a firm conviction as to the allegation sought to be established." *Id.* In making such determination, this court must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.*

■ ■ First and foremost, we are mindful of the fact that Ark. Code Ann. § 9-27-341, by its express language vests a chancellor with discretion to decide whether or not to terminate parental rights, stating: "The court *may* consider a petition to terminate parental rights . . . ." (Emphasis added.) Accordingly, the mere existence of potential grounds for termination does not require a chancellor to terminate parental rights. That decision must be guided by a determination of whether or not reunification can be accomplished within a reasonable time so as to provide permanency and stability in a child's life. *See* Ark. Code Ann. § 9-27-341(a). Here the chancellor, in the exercise of his discretion, essentially gave Minton a final chance to comply with the case plan. At that time, it is apparent that M.M. was going to be moved from her therapeutic foster home, so there was not a permanency issue at that point. Consequently, disposition of this case does not hinge on what occurred prior to the chancellor offering Minton this second chance.

DHS contends that this case is affirmable based on Minton's failure to materially support M.M. Minton concedes that she never

paid the court-ordered support, and the construction of Ark. Code Ann. § 9-27-341 that she urges this court to adopt is contrary to the plain wording of the statute. Furthermore, Minton's resort to *Crawford v. Arkansas Dep't of Hum. Servs., supra,* does not compel a different result. While the supreme court in *Crawford* at one point mistakenly substitutes "and" for the "or" in the statute, in that case, the parent whose rights were terminated had failed both to maintain contact and to support his children. The supreme court did not hold that both failures were necessary. Also, the appellant in *Crawford* claimed that he provided clothing for his children, and the supreme court did not find that it constituted sufficient support.

■ However, we cannot find that there is appreciable evidence that Minton had the ability to pay even a nominal amount of support even after she stopped abusing drugs and started working at regular employment. Consequently, we find it hard to conclude that Minton willfully refused to pay the support. Indeed, according to DHS, one of the reasons that it opposed returning M.M. to Minton was that it concluded that Minton's indebtedness prevented her from achieving self-sufficiency.

■ ■ Finally, the chancellor's requirement that there be a determination of whether or not Minton and M.M. had "bonded" is simply unreasonable given the circumstances of this case. Minton was allowed only a single overnight visit; M.M.'s foster mother acknowledged that M.M. required two or three weeks for "settling in," and DHS steadfastly opposed giving Minton that kind of time. Moreover, the sparse anecdotal evidence offered by persons who confessed to having no expertise in determining the capacity of M.M. for bonding with her mother does not satisfy the clear-and-convincing-evidence standard. Consequently, we hold that the chancellor's ultimate conclusion that M.M., a toddler, had not and was unlikely to bond with Minton is clearly erroneous.

Reversed and remanded.

PITTMAN and GRIFFEN, JJ., agree.