Frank TODD and Debra Nelson *v.* ARKANSAS DEPARTMENT
of HUMAN SERVICES

CA 03-493                                        151 S.W.3d 315

Court of Appeals of Arkansas
Division III and IV
Opinion delivered February 18, 2004

[Rehearing denied March 24, 2004.*]

---

* HART, would grant rehearing.

*Lora Noschese*, for appellant Frank Todd.

*DeeNita D. Moak*, for appellant Debra Nelson.

*Gray Allen Turner*, for appellee.

*Janet L. Bledsoe*, attorney *ad litem*.

KAREN R. BAKER, Judge. The circuit court of Benton County terminated the parental rights of appellants. The court included in its findings that each parent, either as the offender or as an accomplice, committed a felony battery against another child which resulted in the subsequent death of that child. Each parent challenges the respective termination. We have consolidated their arguments for appeal. The father, Frank Todd, challenges the sufficiency of the evidence. The mother, Debra Nelson, challenges the sufficiency of the evidence and argues that the Department of Human Services (DHS) failed to prove its grounds for terminating parental rights. She also argues that the trial court erred in denying her one year from the time her child was removed from her home to remedy the situation that caused the removal. We find no error and affirm.

On January 13, 2002, the then two-year-old son of Frank Todd and Debra Nelson, was taken into protective custody by the Arkansas Department of Human Services for a seventy-two-hour hold as a result of massive head trauma inflicted upon an infant grandson of Debra Nelson, Noah Caldwell. Four-month-old Noah was pronounced dead on January 14, 2002, a result of these severe injuries. Although the petition for emergency custody cited two conditions for J.T.'s removal, the medical condition of Noah caused by a caretaker in the home and the environment of the residence, it is clear that the primary reason for removal was the injury suffered by Noah while in appellants' care.

Frank Todd was arrested and charged with the capital murder of Noah Caldwell. At the time of the termination hearing, he was being held without bond in the Benton County jail while awaiting trial. A probable cause hearing was held on January 23, 2002, and an adjudication date was set in accordance with Arkansas law. Shortly thereafter, the Department of Human Services filed notice of intention to recommend that a finding of no reunification services be entered against the father, Frank Todd, based on his having allegedly committed murder of a child, having committed a felony battery or assault that results in serious bodily injury to any child, and/or subjecting J.T. to aggravated circumstances.

An adjudication hearing was held on March 8, 2002. Mr. Todd did not testify. Debra Nelson testified that she had met Frank Todd in a psychiatric facility, Charter Hospital, in San Antonio, Texas, while both were patients at the facility. Mr. Todd was being treated for depression and for fighting with his son. Ms. Nelson was being treated for depression and to address issues concerning her being abused by her father and later by the husband to whom

she was married during the hospitalization. Mr. Todd and Ms. Nelson never married, but some months after their meeting, Mr. Todd moved in with Ms. Nelson. At the time Jacob was taken into custody, the two had been live-in companions for three to four years. Ms. Nelson had been on medication after her release from the hospital. When she decided she wanted to have another child, she spoke with her psychiatrist who said she would need to discontinue her medication before becoming pregnant. Although she could not remember exactly when she stopped taking her prescriptions, she knew it was sometime before she became pregnant with J.T. There was no evidence that she ever resumed her medication.

Ms. Nelson also testified that Mr. Todd had continued to take medication throughout the time she had known him; however, he would periodically neglect taking his medication. Ms. Nelson stated that she would "get on to him, and make sure that he was taking" his medications. She further stated that these lapses were never extensive and that she believed that at the time of Noah's death that Mr. Todd was taking his medication.

Ms. Nelson described Mr. Todd as verbally abusive and recounted two instances of physical abuse within the year preceding Noah's death. The first incident was against Ms. Nelson. She explained that during an argument that he "had taken his belly" and shoved her. The second was against her seventeen-year-old daughter. Ms. Nelson told how her daughter and Mr. Todd were verbally arguing and that when her daughter refused to go to her room, that Mr. Todd held his knuckles up to her throat, "shoved his belly at her," and told her to go to her room. Ms. Nelson said she called the police after each incident. After the second incident, Mr. Todd admitted himself to a psychiatric ward. Mr. Todd returned to the home about a month later.

When questioned about how J.T.'s leg was broken when he was seven months old, Ms. Nelson explained that he was standing right in front of her when it happened. She had her feet on the walker in front of her, and J.T. was climbing on the edge of the walker. She took him down from the walker several times, but he eventually slipped, and his foot was caught breaking his leg.

Regarding the events that led to Noah being in her care at the time of his death, Ms. Nelson explained that a Texas court granted her daughter temporary custody of Noah and her granddaughter, Zoe, who was about twenty-one months old at the time. Ms. Nelson had attempted to intervene to obtain temporary

custody, but the Texas court refused and ordered that the children not be removed from the State of Texas. She explained that she understood that restriction to mean that the children could not be moved permanently out of the State of Texas, and that she left the next day with the children for them to visit her in Arkansas. This occurred sometime in December 2001.

In response to questions regarding injuries on her grandchildren when they came into her care, Ms. Nelson stated that Zoe had normal bumps and bruises from being an active child and that Noah had none. She explained that when she brought the two children to Arkansas, Mr. Todd became the primary caretaker for all three of the young children in the household. Ms. Nelson's teenage daughter was not at home much. She described her work-week as five to six days a week with eight to fifteen hours a day. She explained that Mr. Todd's previous hospitalizations and incidents of physical aggression caused her no concerns regarding Mr. Todd's caring for three young children. She said that his problems were with teenagers, not young children. She further testified as to his commendable care of J.T., including walking the floors with the colicky child at night.

Ms. Nelson also related one incident of Noah having trouble breathing prior to the infliction of head trauma on January 13, 2002. She said she was at work when Mr. Todd called to say that Noah was having difficulty breathing and his lips were turning blue. She left work immediately and upon her arrival home found the baby "breathing hard, his heart racing, fussy, but still smiling".

On the night of the fatal injuries, she testified that she left the home around twenty minutes before 8:00 p.m. to go to the hospital to visit her sister-in-law and her new baby. She had planned to leave earlier because visitation ended at 8:00, but had been delayed. Immediately prior to leaving she was holding and playing with Noah who was laughing and smiling at her while she bounced him. She placed him in his swing where he was starting to go to sleep as she and her teenage daughter were leaving. Mr. Todd was in a good mood, on the couch watching television. Ms. Nelson did, however, offer that they had a rough day grocery shopping with all three kids while her older daughter slept, "doing all the grocery shopping, bringing everything back" after shopping at Wal-Mart.

Within three minutes of her arrival at the hospital, Mr. Todd called to say the baby was breathing funny, turning blue, and not responding. Ms. Nelson explained that it reminded her of when

the baby had pneumonia, and she directed Mr. Todd to run hot water in the shower to see if the steam would help the baby breathe. She said she told him to call 911 if it didn't help, and she left for home. When she arrived, the emergency personnel were transferring Noah from the house to an ambulance. At the hospital, she described Mr. Todd as behaving angrily, complaining that law enforcement officers were watching him, like they thought that he had done something. She explained that she was concerned for her grandson and that she didn't have time to address Mr. Todd's complaints.

Deputy Randy Clark with the Benton County Sheriff's Office testified that he was at the hospital, investigating the injuries to Noah, when Mr. Todd arrived. Deputy Clark explained to Mr. Todd his *Miranda* rights, and Mr. Todd agreed to speak with him. Mr. Todd explained that he was watching television when he noticed the baby slumped over in the child's swing. Ms. Nelson was getting ready to leave for the hospital, and he asked her to take at look at the baby. Ms. Nelson just laughed and said the baby was playing. Shortly after Ms. Nelson left, Mr. Todd looked back at the swing, and the baby was in the same position. So he picked the baby up. When he could not elicit a response from the child, he called Ms. Nelson. Mr. Todd said that Noah had done this before and that Ms. Nelson had got the baby breathing again. He couldn't, and he called 911.

Rich Connor, an investigator with the Sheriff's office, also investigated the events surrounding Noah's death. He described bruises and an indentation on Noah's face and head. He said that Mr. Todd had explained the bruise saying that Noah had fallen off the sofa. When Investigator Connor discovered that there were two other young children at the home with a teenage girl, the officers went to check on them. This was around midnight. They woke everyone up. They described the place as a "filthy mess." There were clothes, trash, dirty dishes, and dirty cat boxes. Fresh meat, still in the Wal-Mart sacks, was in the floor and the cats were trying to get into it. They found a bottle with rotten milk in J.T.'s bed. J.T's bed was dirty with what appeared to be blood stains on the pillow. Every bed in the house, every sheet, and every pillow, had a stain on it that he believed to be blood, including baby Noah's bassinet. Investigator Connor stated that some of the apparent blood stains were brown, and some were red. The baby's

swing where Noah had been slumped was so stained that he could not determine whether any of the stains were blood stains from his initial observations.

Dr. George Schaefer was the pediatrician who treated Noah on the night of January 13. He testified that Ms. Nelson had told him that the baby had been a little fussy that day and didn't eat well, but had no current illness. She did not offer information as to why Noah had been brought to the emergency room. Dr. Schaefer described the swelling of the baby's head and that he was not breathing on his own. His examination revealed bruises of varying ages from several days old to within a day or two. He testified that because of the baby's developmental stage, it would be unusual to have bruises in those areas resulting from the baby's own activities.

Dr. Schaefer also explained that Noah had bilateral retinal hemorrhages. He testified that this condition is expected whenever you have a severe or significant trauma to the head, and is especially common in child abuse cases. He commented that Noah's hemorrhages were very obvious. He explained that this medical condition does not happen spontaneously and severe force would have had to have been used to sustain the damage. He was asked to estimate the time of injury. He stated that he believed 911 was called about 8:15 p.m., and that when he first examined Noah around 9:30 p.m. that the body was already cold. He explained that it takes a body temperature time to fall. He estimated that the injuries could have occurred anywhere from two to four hours before he arrived and first saw the child. When questioned as to whether the body could have lost that much warmth between 8:00 p.m. to 9:30 p.m., the doctor explained that if Noah had been in a warm home and a warm ambulance during the time after he sustained the injury, that he would not expect such a low body temperature to develop within that time frame. In spite of his testimony regarding Noah's body temperature, Dr. Schaefer could not testify for certain when the injuries occurred and allowed that it was possible they had occurred around 8:00 p.m. Noah remained on life support in the care of Dr. Schaefer until he was transferred to Arkansas Children's Hospital.

The deposition of Dr. Jerril Green was incorporated into evidence. He testified that Noah died of traumatic brain injury. In addition to several skull fractures, Noah also had rib fractures. Dr. Green stated these were at least two weeks old, but could possibly have been as old as two months. He also testified that rib fractures in a baby Noah's age are a common finding in physical abuse cases.

He explained that the rib fractures found in Noah would have taken considerable force, and were non-accidental.

After the hearing, the court found that J.T. was dependent-neglected. In the order terminating parental rights, the court found that each parent either, as the offender or as an accomplice, had committed a felony battery against the child, Noah Caldwell, resulting in his subsequent death. Although other factors and findings are also cited, it is this factor which was critical to the termination.

■■ The burden on the party seeking to terminate the parental relationship is a heavy one under Arkansas law. *Malone v. Arkansas Dep't of Human Servs.*, 71 Ark. App. 441, 30 S.W.3d 758 (2000). Arkansas Code Annotated section 9-27-341(b)(3) (Repl. 2002 & Supp. 2003) requires that an order terminating parental rights must be based on clear and convincing evidence. When the burden of proving a disputed fact in a termination proceeding is by clear and convincing evidence, the inquiry on appeal is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. *Minton v. Arkansas Dep't of Human Servs.*, 72 Ark. App. 290, 34 S.W.3d 776 (2000). A finding is clearly erroneous when, although there is evidence to support the finding, after reviewing all of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Nichols v. Wray*, 325 Ark. 326, 925 S.W.2d 785 (1996). In resolving the clearly erroneous question, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

Arkansas Code Annotated section 9-27-341 provides as grounds for terminating parental rights, that:

> ix(a)  The parent is found by a court of competent jurisdiction to:
>
> (1) Have committed murder or voluntary manslaughter of any child or to have aided or abetted, attempted, conspired, or solicited to commit such murder or voluntary manslaughter;
>
> (2) Have committed a felony assault that results in serious bodily injury to any child;

Ark. Code Ann. § 9-27-341(b)(1)(A)(3)(B)(xi)(a)(1 & 2).

Under Ark. Code Ann. section 5-2-403 (Rep. 1997), an accomplice is defined as follows:

> (a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:
>
> (1) Solicits, advises, encourages, or coerces the other person to commit it; or
>
> (2) Aids, agrees to aid, or attempts to aid the other person in planning or committing it; or
>
> (3) Having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.

A defendant can be an accomplice to murder even though the defendant's participation in the murder is, compared to that of the principal, relatively passive. *See Henry v. State*, 278 Ark. 478, 486-87, 647 S.W.2d 419, 424, *cert. denied*, 464 U.S. 835 (1983); *see also Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). The following factors are relevant in determining the connection of an accomplice with the crime: presence of the accused in the proximity of a crime, opportunity, and association with a person involved in the crime in a manner suggestive of joint participation. *Hooks v. State*, 303 Ark. 236, 795 S.W.2d 56 (1990). Accomplice liability may be shown by circumstantial evidence, without direct proof of a conspiracy agreement. *Purifoy v. State*, 307 Ark. 482, 487, 822 S.W.2d 374, 377 (1991); *King v. State*, 271 Ark. 417, 609 S.W.2d 32 (1980). Under the accomplice liability statute, a defendant may properly be found guilty not only of his own conduct, but also by the conduct of his accomplice. *Id.*; *King, supra*. When two or more persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.*; *Parker v. State*, 265 Ark. 315, 578 S.W.2d 206 (1979). There is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Id.*; *Parker, supra*.

We cannot say that the trial court clearly erred in finding that either Ms. Nelson or Mr. Todd inflicted the injuries on Noah and that the other was an accomplice. The doctor's testimony concerning the time and extent of injuries support the

court's conclusion that Ms. Nelson was in the home when the injuries were inflicted upon Noah. Ms. Nelson testified that she was running late for visitation that ended at 8:00, but she was playing with a laughing and happy baby immediately before leaving. Yet she told the attending physician at the hospital that the baby had been fussy and not eaten well, and that they had a rough day grocery shopping with the children at Wal-Mart. The officers, upon arriving at the home, found fresh meat in the floor, still in the Wal-Mart sack, where the cats were trying to get into it, rather than having been put away.

The judge specifically discredited Ms. Nelson's testimony regarding her whereabouts at the time Noah suffered the injuries. The implausibility of Ms. Nelson's story is one criteria by which to judge her credibility and may be an indication of culpability. *See Dopp v. Sugarloaf Min. Co.*, 288 Ark. 18, 702 S.W.2d 393 (1986) (describing implausible explanation as criteria as equally reliable as witness demeanor in determining credibility); *Whitmore v. State*, 263 Ark. 419, 565 S.W.2d 133 (1978) (affirming where appellant provided a rather implausible explanation given appellant's education and faced with the serious charges of which he was told).

Additionally, circumstantial evidence can be sufficient to support the conviction of battery of a child. *Reams v. State*, 45 Ark. App. 7, 870 S.W.2d 404 (1994); *Payne v. State*, 21 Ark. App. 243, 731 S.W.2d 235 (1987). In *Reams*, the court affirmed the conviction of a mother for first-degree battery of her child, rejecting her argument that her live-in companion, and not she, had severely abused her child. This court found that the appellant's improbable statements explaining the injury, the nature of the injuries to the child, the medical evidence, and the appellant's admission that she had the opportunity to abuse the child constituted substantial circumstantial evidence of guilt.

However, before parental rights may be terminated, there must also be clear and convincing evidence that it is in the best interest of the juvenile pursuant to section 9-27-303 subsections (b)(3)(A)(i) and (ii). *Conn v. Arkansas Dep't of Human Servs.*, 79 Ark. App. 195, 85 S.W.3d 558 (2002) (holding that even when subsection (b)(3)(B)(ix)(a)(4) is satisfied with clear and convincing evidence that parental rights have been involuntarily terminated as to a sibling, parental rights cannot be terminated unless there is also

clear and convincing evidence pursuant to subsections (b)(3)(A)(i) and (ii) that it is in the best interest of the juvenile).

A dependent–neglected juvenile is defined as "any juvenile who as a result of abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness is at substantial risk of serious harm." Ark. Code Ann. § 9-27-303(15)(A) (Repl. 2002). Arkansas Code Annotated section 9-27-302(2)(B) provides that one purpose of the Juvenile Code is "[t]o protect a juvenile by considering the juvenile's health and safety as the paramount concerns in determining whether or not to remove the juvenile from the custody of his parents or custodians...."

In *Brewer v. Arkansas Department of Human Services.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001), we explained:

> Parental unfitness is not necessarily predicated upon the parent's causing some direct injury to the child in question. Such a construction of the law would fly in the face of the General Assembly's expressed purpose of protecting dependent-neglected children and making those children's health and safety the juvenile code's paramount concern. To require [another child] to suffer the same fate as [a sibling] before obtaining the protection of the state would be tragic and cruel.

71 Ark. App. at 368, 43 S.W.3d at 199; *see also Arkansas Dep't of Human Servs. v. McDonald,* 80 Ark. App. 104, 91 S.W.3d 536 (2002).

Similarly, to require J.T. to suffer the same fate as Noah before obtaining the protection of the law would be tragic and cruel. Therefore, we hold that the trial court did not err in finding that it was in the child's best interest to terminate parental rights.

Ms. Nelson also argues that the trial court erred in denying her one year from the time her child was removed from her home to remedy the situation that caused removal. However, the grounds for removal based upon the commission of a felony battery provide for immediate termination of parental rights. She fails to cite any relevant case law supporting her argument. When a party cites no authority or convincing argument on an issue, and the result is not apparent without further research, the appellate court will not address the issue. *See Webber v. Arkansas Dep't of Human Servs.,* 334 Ark. 527, 975 S.W.2d 829 (1998); *Country Corner Food & Drug, Inc. v. First State Bank,* 332 Ark. 645, 966 S.W.2d 894 (1998).

Accordingly, we affirm.

GLADWIN, ROBBINS and VAUGHT, JJ., agree.

HART and NEAL, JJ., agree in part and dissent in part.

JOSEPHINE LINKER HART, Judge, dissenting. Because there was no evidence that appellant, Debra Nelson, committed a felony battery upon her grandson, Noah Caldwell, I conclude that the circuit court's decision to terminate Nelson's parental rights with respect to her son, J.T., was clearly erroneous. Hence, I respectfully dissent.

In addition to showing by clear and convincing evidence that it is in the best interest of the child, an order terminating parental rights must be based on clear and convincing evidence of one or more grounds, including that the parent is found by a court of competent jurisdiction to "[h]ave committed a felony battery or assault that results in serious bodily injury to any child...." Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(2) (Supp. 2003). In its order terminating Nelson's parental rights, the circuit court found that she "committed a felony battery or assault that result[ed] in serious bodily injury to any child...." The majority affirms, concluding that Nelson committed, as a principal or an accomplice, a felony battery upon Noah.

First, I must note that being an accomplice to a felony battery of any child does not warrant termination of parental rights. In comparison, accomplice liability suffices to support termination of parental rights under Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(1) (Supp. 2003), which provides that an order terminating parental rights may be based on a finding that the parent "committed murder or voluntary manslaughter of any child or ... aided or abetted, attempted, conspired, or solicited to commit the murder or voluntary manslaughter...." The subsection on felony battery, however, makes no provision for accomplice liability, and given that the murder and manslaughter subsection specifically provides for accomplice liability, we should not infer that being an accomplice to a felony battery suffices to support termination of parental rights.

Second, even if accomplice liability sufficed, the majority fails to refer to any evidence that Nelson committed the crime as either a principal or an accomplice. In support of its conclusion to the contrary, the majority cites *Reams v. State*, 45 Ark. App. 7, 870 S.W.2d 404 (1994), where this court concluded that Reams's

improbable statements, along with the nature of the injuries to the child, the medical evidence, the opinions of the physicians, and her opportunity to commit the crime, were substantial evidence that she committed a battery upon a child.

Here, while the court found that Nelson's testimony was not credible, there was nothing about her testimony regarding Noah's injury that could be considered "improbable." There was no testimony that Nelson, as did Reams, admitted that she was lying or told anyone they "got [their] story straight." Further, there was no testimony that Nelson was present when the injury occurred. Reams, on the other hand, had exclusive control of the child. Here, it was an undisputed fact, and the court so found, that Frank Todd kept Noah in his sole care for long periods of time. Moreover, neither of the two testifying physicians could even pinpoint when the injury occurred. Dr. George Schaefer, a pediatrician, testified that he could not with certainty state when the injury occurred. Dr. Jerril Green, a pediatric intensive-care physician, also testified that he could not determine when the injury occurred. He could only say that the injury likely occurred "within hours" of Noah arriving at the hospital, but he could not say how many hours. Even more troubling, though Frank Todd was in jail awaiting trial for capital murder for Noah's death, there was no testimony from a forensic pathologist. Furthermore, unlike the child in *Reams*, Noah had not suffered multiple injuries while in the sole care of appellants. While Noah had suffered rib fractures, there was testimony that the rib fractures could have been as old as two months. Appellants had custody of Noah only for one month, and there was no evidence that the rib fractures would have been visible to any person caring for the child.

Thus, while it was apparent that Nelson was with Noah on the day of the injury, there was no evidence, circumstantial or otherwise, that she battered Noah or acted as an accomplice in the commission of the battery. Without more, I simply cannot conclude that the circuit court's decision to terminate Nelson's parental rights on this basis was proper.

NEAL, J., joins.