Phillip CHASE *v.* ARKANSAS DEPARTMENT OF
HUMAN SERVICES

CA 03-1246                                          184 S.W.3d 453

Court of Appeals of Arkansas
Divisions II and III
Opinion delivered May 19, 2004

238

*Simon L. Blatt*, for appellant.

*Gary Allen Turner*, for appellee.

*Janet L. Bledsoe*, attorney *ad litem*.

WENDELL L. GRIFFEN, Judge. Phillip Chase appeals from a final order terminating his parental rights to his son, N.C. (born February 24, 1993). Appellant argues that the evidence was insufficient to support termination of his parental rights, and he asks that we reverse the trial court's order. We hold that the trial court's decision to terminate the parental rights of the appellant was not clearly erroneous. Thus, we affirm.

On January 27, 2000, the Department of Human Services ("DHS") filed a petition for emergency custody of N.C. because N.C. had bruises and bedsores for which the appellant had not sought medical treatment, because N.C. had not been in school since November 1999, and due to allegations of sexual abuse. On February 1, 2000, the trial court found probable cause to remove

N.C. from appellant's custody[1], ordered appellant to attend parenting classes, undergo a psychological evaluation, and attend counseling if recommended as a result of the psychological evaluation. N.C. was found to be dependent-neglected by the trial court on March 7, 2000. DHS failed to prove that there was sexual abuse by a preponderance of the evidence. The parties stipulated that there was medical neglect, educational neglect and physical abuse. During the next review hearing, appellant was found to be in partial compliance with the court's earlier orders. He was ordered to obtain appropriate housing, to obtain counseling, and to attend and complete domestic violence classes.

A permanency planning hearing was held and an order issued on March 12, 2000. DHS filed a petition for the termination of parental rights on December 15, 2000, but the petition was denied after a February 12, 2001 hearing. Due to appellant's partial compliance with the trial court's orders, inconsistency with housing, and failure to comply with counseling, DHS filed another petition for termination of appellant's parental rights on October 4, 2001. The trial court referenced the fact that appellant had remarried since N.C. went into the State's custody, and his wife, Priscilla, was an untreated alcoholic. However, the petition was denied again.

At a May 16, 2002 review hearing, the trial court approved a trial placement between appellant and N.C., in addition to a visitation arrangement. The conditions of visitation included that appellant pay for daycare services for N.C. while he was at work. In addition, N.C. was not to be left alone with appellant's wife, Priscilla. The trial placement took place from August 15, 2002, until November 7, 2002. On November 12, 2002, the court ordered that the trial placement with appellant be terminated and that N.C. be returned to foster care. The trial court terminated the trial placement based on evidence that N.C. had not received his medication, appellant failed to take N.C. to counseling, N.C.'s grades deteriorated, he was dismissed from his after-school program because appellant did not pick him up on time, and because appellant's home was roach infested.

On March 26, 2003, DHS filed a new petition for termination of appellant's parental rights, and asked the court to grant a consent to adoption petition. Appellant's rights were terminated

---

[1] The mother of N.C. is deceased.

on June 23, 2003. The trial court found that N.C. had been out of appellant's home since January 25, 2000, and, that despite meaningful efforts on the part of DHS to provide services to effect reunification and to rehabilitate the home, appellant had not remedied the conditions that caused the removal.

▮▮ The standard of review in termination of parental rights cases is as follows:

> We have held that when the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. The facts warranting termination of parental rights must be proven by clear and convincing evidence. In reviewing the trial court's evaluation of the evidence, we will not reverse unless the court's finding of clear and convincing evidence is clearly erroneous. Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction regarding the allegation sought to be established. In resolving the clearly erroneous question, we must give due regard to the opportunity of the [trial court] to judge the credibility of witnesses. Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations.

*Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 328, 42 S.W.3d 397, 403-04 (2001) (citing *Ullom v. Arkansas Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 208 (2000)) (citations omitted).

Appellant argues that there was insufficient evidence to terminate his parental rights. The trial court terminated the appellant's parental rights pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Repl. 2002)[2], which states that a parent's rights can be terminated if there is clear and convincing evidence that the juvenile has been adjudicated dependent-neglected, has been out of the home for twelve months, and despite an effort by DHS to rehabilitate the home, those conditions have not been remedied by the parent. We hold that the trial court's determination is not clearly erroneous.

---

[2] Ark. Code Ann. 9-27-341(b)(3)(B)(i)(a) was amended in 2003, but the changes were only stylistic.

Appellant did not have legal custody of his child for three years before the trial court issued its order terminating his parental rights. DHS put forth extensive efforts to rehabilitate the home. DHS provided homemaker services that addressed parenting, budgeting, and cleanliness of the home. DHS also provided transportation assistance and discussed with appellant what was expected from him on the case plan. In addition, DHS provided furniture, HUD referrals, and food stamps.

The trial court ordered a trial placement that began on August 15, 2002, and was terminated on November 7, 2002. During the trial placement, the court found that, among other things, N.C.'s health needs were not being met and his grades were lower than when he was in foster care. Appellant partially complied with the case plan, but he continued to make decisions adverse to the child. Even though the trial court had ordered that no one with head lice was to visit appellant's home, a DHS worker observed three children with head lice in the home during N.C.'s trial placement. Appellant failed to take N.C. to counseling during the trial placement, and N.C. was discharged from an after school program because appellant failed to pick him up on several occasions. N.C.'s medicine was also not properly administered during the trial placement, and the court found that appellant's housing was not appropriate.

The court's initial probable cause order finding the juvenile dependent-neglected found that there was medical neglect, educational neglect, and physical abuse. Under Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Repl. 2002), the court can terminate appellant's parental rights if those areas are not remedied after twelve months, and DHS made a reasonable effort to rehabilitate the home. In this case, after three years appellant failed to demonstrate the ability to properly care for his son. During the trial placement he neglected his son's medical and educational needs. We hold that the trial court's decision terminating appellant's parental rights regarding N.C. is not clearly erroneous.

Affirmed.

GLADWIN, NEAL, and VAUGHT, JJ., agree.

HART and ROAF, JJ., dissent.

JOSEPHINE LINKER HART, Judge, dissenting. I dissent to voice my opposition to the evisceration of our standard of review

in parental-rights-termination cases. While we purport to require that the facts warranting termination of parental rights be proven by clear and convincing evidence, today's opinion affirms a decision grounded in, at best, a bare preponderance, if indeed it rises to that level. Even more troubling, the majority has, in my view, imposed a watered-down substantial-evidence standard of review in affirming.

Termination of Mr. Chase's parental rights was predicated on findings made pursuant to Arkansas Code Annotated section 9-27-341, which states in pertinent part:

> (3) An order forever terminating parental rights shall be based upon a finding by clear and convincing evidence:
>
> (A) That it is in the best interest of the juvenile, including consideration of the following factors:
>
> (I) The likelihood that the juvenile will be adopted if the termination petition is granted; and
>
> (ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent, parents, or putative parent or parents;
>
> (B) Of one (1) or more of the following grounds:
>
> (i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the Department to rehabilitate the home and *correct the conditions which caused removal*, those conditions have not been remedied by the parent.

(Emphasis supplied.)

If we were properly applying the standard of review, to affirm we must find that the trial court was not clearly erroneous in finding that there was clear and convincing evidence that Mr. Chase failed to remedy the conditions that led to the dependent-neglect adjudication, *i.e.*, physical abuse, medical neglect, and educational neglect, all of which were "stipulated" to by the parties. It is noteworthy that the original reason for taking N.C. into DHS custody, suspected sexual abuse, had been determined to be unfounded at the adjudication hearing.

Physical abuse has not been an issue in this case since it was stipulated to as a basis for in the original adjudication order, which was entered more than four years ago. The record indicates that

Mr. Chase complied with all aspects of the case plan that related to physical abuse. Furthermore, physical abuse was not mentioned in the termination petition, the termination hearing, or the termination order. That left only the alleged medical and educational neglect. I have scoured the record and I simply cannot find sufficient evidence to conclude that these conditions persist at a level sufficient to justify the termination of Mr. Chase's parental rights, if indeed these conditions exist at all. The medical neglect that caused N.C.'s adjudication was apparently a rash on N.C.'s arm for which Mr. Chase had not sought treatment for, and the "educational neglect" related to the fact that N.C. had not been in school from December 7, 1999, until he was taken into DHS custody in January of 2000. DHS had the burden of proving that these conditions still existed at the time of the termination hearing, and they utterly failed to do so.

What evidence did DHS rely on? Regarding the supposed persistence of "medical neglect," there was testimony that during the so-called "trial placement" from August 15 until November 7, 2002, Mr. Chase failed to take N.C. to counseling, failed to properly administer medication, and failed to get N.C.'s glasses fixed. Significantly, absent the stress brought on by DHS's attempt to terminate his father's parental rights, N.C.'s alleged need for counseling had ended. N.C.'s therapist, Debra Brown, testified at the termination hearing that she had been treating N.C. for "Post Traumatic Stress to begin with," and that she had "terminated with him until the last court hearing." The last court hearing was the permanency placement proceeding in which the trial court decided to terminate Mr. Chase's parental rights. As for Mr. Chase allegedly not giving N.C. medication, the record does not even disclose the type of medication that N.C. was supposed to take. Furthermore, any importance that the medication could have had is belied by the failure of DHS to assert any adverse affect caused by N.C. not being medicated. The proof concerning the persistence of this alleged problem during the two years since DHS caused the so-called trial placement to be aborted is even more flimsy. DHS case worker Robbie McKay's bald assertion that there were "times" that N.C. did not receive his medication on weekend visits, was unequivocally disputed by Mr. Chase's insistence that N.C. received his medicine.

As far as the so-called "educational neglect" was concerned, the majority cites the trial court's finding that N.C.'s "grades were lower" than when he was in foster care, and Mr. Chase's failure to

pick up his son from an after school care program — essentially baby sitting — and N.C.'s poor grades. Regarding the latter, the record indicates that N.C.'s foster parents had the child enrolled in a different school district, so the comparison of the child's report cards is an apples-and-oranges comparison at best. More importantly, we, as was the trial court below, are prevented from even beginning to evaluate the significance of N.C.'s grades because DHS inexplicably failed to introduce into evidence the standards of either school. Significantly, the record does not contain any indication that N.C. had not attended school when he was with Mr. Chase, which was the educational neglect that supported the dependency-neglect adjudication.

Because the conditions that warranted N.C.'s removal from his father's custody had been resolved, DHS apparently found sufficient reason to keep N.C. by imposing new requirements. Even though there were no findings of environmental neglect, DHS nonetheless convinced the trial court that Mr. Chase's parental rights should be terminated because of the subjective determination by a DHS worker that there were "parenting issues" (like reminding N.C. to brush his teeth), "budgeting" concerns (he apparently abandoned some furniture before he moved into his current residence of more than two years), and home cleanliness questions (roaches apparently escaped fumigation in the duplex where Mr. Chase resides). Regarding the latter, Mr. Chase had earlier in his long and unhappy experience with DHS been found not in compliance with the case plan because he had not found a "permanent" residence. It is not without irony that because he has complied with that aspect of the case plan, he has opened himself up to new DHS criticism. It is not surprising that Mr. Chase found himself unable to satisfy his case plan — it was not a goal, it was a moving target.

Despite it all, Mr. Chase and his son have maintained a strong bond. Furthermore, by DHS's own admission, Mr. Chase has "exercised every visit" that he was given by the court, was current in his court-ordered child support, and has maintained stable housing and stable employment. Certainly, Mr. Chase's level of compliance with the case plan in terms of duration and fidelity to its stated requirements are at least of the same magnitude as the appellant in *Trout v. Arkansas Dep't of Human Servs.*, 2004 WL 161334, and *Minton v. Arkansas Dep't of Human Servs.*, 72 Ark. 290, 34 S.W.3d 776 (2000), both cases where we reversed a termination of parental rights. Our decisions in those cases stood on the

scrupulous application of the proper standard of review. I can only remind the bench and the bar that clear and convincing evidence is that degree of proof that will produce in the fact finder a firm conviction regarding the allegation sought to be established. I note that this standard is found in at least one opinion authored by every member of the majority, which makes our decision today all the more inexplicable.

Finally, Arkansas Code Annotated section 9-27-341 explicitly requires that termination of parental rights be based on a finding, supported by clear and convincing evidence, that the termination is in the "best interest of the juvenile." If anything, the evidence in this case proved that termination of Mr. Chase's parental rights was **not** in N.C.'s best interest.

N.C. is apparently thriving in foster care; he is an honor roll student and is fond of his foster parents. At the same time, however, it is also clear that N.C. feels love and loyalty toward his dad, and would be adversely affected if contact with his father was severed. According to N.C.'s therapist since March of 2000, Debra Brown,

> making this decision [to terminate parental rights] could put [N.C.] in a position that would be very difficult for him and traumatic. This isn't an easy case. I think it is impossible to judge what kind of problems might occur if the court terminates the parental rights. I think it would be a relief for him to have something settled. He has expressed various wishes at various times telling me that he doesn't want to have to pick, he doesn't want to make that decision. When [NC] was in foster care and visiting with his father, he made substantial progress as long as he didn't know about court.

Significantly, DHS had attempted to terminate Mr. Chase's parental rights on two prior occasions, with petitions filed on December 15, 2000, and October 4, 2001. The third time was a charm. I find it completely disingenuous for the majority to sanction such a process. If ever there was a situation where the status quo should have been maintained to effectuate the best interest of the juvenile, this was one. The status quo would be maintained if we were to reverse.

I respectfully dissent.