
# ARKANSAS COURT OF APPEALS

DIVISIONS I & II

No. CV–14–315

CRYSTAL SCHAIBLE

APPELLANT

V.

ARKANSAS DEPARTMENT OF
HUMAN SERVICES AND MINOR
CHILDREN

APPELLEES

Opinion Delivered October 8, 2014

APPEAL FROM THE BENTON
COUNTY CIRCUIT COURT
[NO. JV12-398-D/N]

HONORABLE THOMAS E. SMITH,
JUDGE

AFFIRMED

## RITA W. GRUBER, Judge

Appellant, Crystal Schaible, appeals from an order of the Benton County Circuit Court terminating her parental rights to her son, Z.B., born June 2, 2012. She contends on appeal that the evidence was insufficient to support the circuit court's decision and that the court abused its discretion in allowing DHS to recall a witness. We find no error and affirm the circuit court's order.

Before this case began, appellant was involved with DHS from 2009 through 2012 regarding two older children. DHS's involvement began when it was discovered that both children had prenatal exposure to marijuana, and DHS involvement continued with investigations into inadequate supervision, food, and clothing; continued drug use by appellant; and homelessness. Appellant's parental rights were voluntarily terminated to those two children on February 7, 2012. The case before us began on June 4, 2012, when DHS initiated a 72-hour hold on Z.B. due to his testing positive for illegal substances at the time

of his birth on June 2, 2012. Z.B. was placed in foster care with the family that had adopted his two half-sisters, and DHS immediately filed a petition to terminate appellant's parental rights.

The first termination hearing was held in September 2012, after which the court denied the petition, finding that appellant had, since Z.B.'s birth three months earlier, remained drug-free, attended NA/AA, maintained employment, maintained a stable relationship, and visited Z.B. on a regular basis. The court granted appellant the opportunity to complete the case plan and stated in its order that it expected her to obtain a GED, obtain a driver's license, attend counseling, attend NA/AA meetings regularly, and submit to regular and random drug tests with negative results. The final termination hearing was held a year later in October 2013, and the court entered its order terminating appellant's parental rights on January 7, 2014.

The course of events that led to the termination suggests that appellant did achieve compliance with many of the court's requirements. Immediately after Z.B.'s birth, appellant appeared to be in a stable relationship with a woman with whom she was living, Dani. The court gradually allowed unsupervised visits and, eventually, a trial home placement of Z.B. with appellant and Dani in April 2013, which ended after six weeks, following a break-up between Dani and appellant.[1]

They had left Z.B. with a caregiver while they went on a float trip over Memorial

---

[1]Appellant continued, however, to have regular unsupervised weekend visits with Z.B. until the termination hearing in October 2013.

Day weekend. Appellant testified that she had consumed a few beers and Dani had consumed more than a few beers. The two argued regarding Dani's attempt to drive while intoxicated. Dani got upset and left and was later arrested for public intoxication and disorderly conduct. Appellant ended the relationship and moved in with a friend, Gina, for several months thereafter. She and Gina then moved to another place that they shared with Mr. Beltran, appellant's deceased mother's long-time boyfriend, considered by appellant to be a father figure. At the time of the termination hearing, she and Mr. Beltran had signed a one-year lease on another apartment they planned to share without Gina. Appellant testified that she had been working at Bradford House Nursing Center for three months at the time of the hearing and had taken classes to become a CNA but had not taken the CNA state exam nor obtained her GED.

Although the reports and testimony indicated that Z.B. suffered from developmental delays, for which he attended occupational therapy several times per week, appellant testified when called by DHS that she had no idea why Z.B. needed therapy, that she did not take him to therapy when he was in her care, and that she did not plan on taking him to therapy if custody were returned to her. Appellant was later recalled when presenting her own case, after Z.B.'s therapist testified, and appeared to have experienced a change of heart regarding Z.B.'s therapy. She told the court that she would provide therapy if he needed it. Z.B. also suffers from asthma, and, although appellant is a smoker, she insisted that she did not smoke around him. Appellant also testified that before Z.B. was born, she had a "serious drug problem" and she admitted that she never completed a drug-treatment program. She said that

she had attended NA/AA meetings for several months after Z.B. was born but that she had not attended since that time. She also testified that she did get urges to use drugs and had dreams about it but that work kept her mind off of it. Finally, appellant testified that she might be pregnant. The court was concerned about this and requested confirmation before it made its decision. The hearing was continued, and at a hearing several days later, appellant's counsel notified the court that appellant was in fact pregnant.

Z.B.'s foster mother testified that when Z.B. returned from visits with appellant, he was either hungry, tired, dirty, sick, or smelled of smoke. It was also clear from the evidence before the court that the foster mother very much wanted to adopt Z.B.

Melinda Lunn, Z.B.'s occupational therapist, gave a detailed explanation of Z.B.'s delays and of the progress he had made in therapy. She testified that therapy was very important to his development and that failure to acquire the skills he needed could have lifelong consequences. At the conclusion of Ms. Lunn's testimony, the court took a five-minute recess. After the recess, DHS asked to recall Ms. Lunn, which the court allowed over appellant's objection. In this additional testimony, Ms. Lunn described Z.B.'s condition after having come from appellant's care to therapy on the day before the hearing. She said his clothing smelled musty and dirty and that his diaper was very full. She described him as being "sticky" and his hair as "greasy" in back and "crunchy" on top.

Brandon Robinson, one of the DHS caseworkers assigned to this case, testified that appellant's support system, instability, and dependence upon others for housing were concerning. He said that he thought there was a high potential for harm if Z.B. were

4

returned to appellant because she never completed a drug-treatment program despite trying, had multiple partners during the course of the case, and demonstrated poor judgment. He testified that DHS's recommendation was termination. Another DHS employee, Michelle Cutrer-Boggess, was involved with appellant in the previous cases and in this case. She was concerned about appellant's history of making questionable decisions and the consistent instability in her life. She was particularly concerned that appellant, given her history of addiction, admitted to drinking beers on her weekend float trip in May 2013. Finally, Z.B.'s caseworker, Shannon Saindon, testified that she was concerned, given appellant's history with drugs and failure to treat her addiction through rehabilitation, that appellant might relapse. It also concerned Ms. Saindon that appellant had not changed her circle of friends.

The CASA volunteer recommended adoption, stating that it was in Z.B.'s best interest to be with his biological sisters in the home he had lived since birth. She also testified that she was concerned about appellant's failure to attend NA/AA meetings.

The dissent quotes from the attorney ad litem's closing argument in which the ad litem states that she is unsure whether there is clear and convincing evidence to support termination. This quote represents a small excerpt from the ad litem's statement to the circuit court. In her argument, the ad litem recognized that this was a close case and recommended that the court give appellant additional time. Her main concern appeared to be that we might reverse a termination, causing even more trauma to Z.B. And while her argument may have been helpful to the circuit court, it was not evidence and the court was not bound by the ad litem's recommendation any more than it was bound by DHS's.

5

At the conclusion of the hearing, the court stated that it was granting the petition for termination. The court expressed alarm that appellant was pregnant again. Although the court did credit appellant with staying clean, it was concerned that she continued to fight the urges of addiction every day without the benefit of a support group or training from a drug-treatment program to strengthen her. The court thought that this prevented her from having long-term stability, particularly given the new stress of having another child. Basically, the court was concerned with appellant's pattern of behavior.

In its order, the court found clear and convincing evidence of two grounds: (1) adjudicated dependent-neglected and out of the custody of appellant for twelve months, and despite a meaningful effort by DHS to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied; and (2) other factors or issues arose subsequent to the filing of the original petition that demonstrate that return of Z.B. to appellant's custody is contrary to his health, safety, or welfare and that, despite the offer of appropriate family services, appellant has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the circumstances that prevent return of Z.B to her custody. Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2013). The court specifically found credible the foster mother's testimony about the condition and care of Z.B. during visits with appellant. The court found by clear and convincing evidence that it was in Z.B.'s best interest to terminate appellant's parental rights. The court found that Z.B. would be at risk of potential harm based on environmental neglect, specifically the cleanliness of the child and the smell of cigarette smoke after visits with appellant. The court also noted inadequate

6

supervision. Finally, the circuit court listed eighteen additional findings, including appellant's voluntary termination of rights to two other children as a result of her inability to resolve her substance-abuse issues; her admission that she continued to fight the urges of addiction; her lack of an adequate support network to help her address the stresses of parenting and drug addiction; her failure to complete any drug-treatment program or obtain a GED; her lack of follow-through with Z.B.'s therapy when he was in her care; her consumption of alcohol during the trial home placement; her pregnancy by a different father; and a repeated pattern of behavior convincing the court that appellant had not resolved her substance-abuse issues because, while "not testing positively for drugs, she has not stopped thinking and behaving in a manner consistent with a person addicted to substances." The court found that appellant lacked the tools necessary to remain clean and believed that the added stress, financial and parenting, of having another child would cause the cycle of addiction to continue and that relapse was likely. Finally, the court found that, "[c]ombined with the lack of follow through by the mother on her drug treatment, her use of alcohol during trial home placement, the state of the child in her care, and the higher stress that will be present with another child on the way, . . . Z.B.'s health and safety will be endangered if returned to the parent."

We review termination-of-parental-rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2013). In making a "best interest" determination, the trial court is required to consider two factors:

7

(1) the likelihood that the child will be adopted, and (2) the potential of harm to the child if custody is returned to a parent. *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 753, at 4, 431 S.W.3d 364, 367. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 248, 947 S.W.2d 761, 763 (1997). Credibility determinations are left to the fact-finder, here the trial court. *Henson v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 225, at 6, 434 S.W.3d 371, 375.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2013). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 3, 434 S.W.3d 378, 381. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Dozier v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 17, at 9, 372 S.W.3d 849, 854. Finally, a parent's past behavior is often a good indicator of future behavior. *Stephens v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 249, at 8, 427 S.W.3d 160, 164.

For her first point on appeal, appellant argues that the evidence was insufficient to support the court's order. A circuit court may terminate parental rights if it finds by clear and

convincing evidence that it is in the best interest of the child, considering the likelihood that the child will be adopted and the potential harm the child would suffer if returned to the parent's custody, and that at least one statutory ground for termination exists. Ark. Code Ann. § 9-27-341 (Supp. 2013). Specifically, appellant appears to challenge the court's potential-harm determination, arguing that the testimony did not establish that she smoked around Z.B. because no witnesses actually saw her do so and she testified that she did not. She also challenges the foster mother's testimony about Z.B. smelling of smoke and being dirty when he returned from visits with appellant, claiming that the foster mother was clearly biased because she wanted to adopt Z.B. Second, she argues that the evidence is not sufficient to support grounds because she remedied the substance abuse. She states that, in review orders entered in October 2012 and January 2013, she was found to have been in compliance with the case plan and was allowed unsupervised weekend visitation after her trial placement ended. She argues that she never failed a drug screen throughout the seventeen-month case.

We turn first to appellant's argument concerning potential harm. Potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. The potential-harm analysis is to be conducted in broad terms. *Id.* It is the "best interest" finding that must be supported by clear and convincing evidence. *Id.* Moreover, credibility determinations are for the circuit court to make, not this court. *Smith*, 2013 Ark. App. 753, at 4, 431 S.W.3d at 367. The circuit court

specifically found the foster mother to be credible; she testified that Z.B. always returned from visits with appellant either hungry, tired, dirty, sick, or smelling of smoke. Finally, the circuit court's determination of potential harm involved much more than its concern with the smell of smoke or the fact that Z.B. returned from appellant's visits dirty. The court specifically found that the combination of the lack of follow-through by the mother on her drug treatment, her use of alcohol during trial home placement, the state of the child in her care, and the higher stress that will be present with another child on the way would endanger Z.B.'s health and safety in appellant's care. The court appeared to have at least as much concern with appellant's lack of judgment—demonstrated by her failure to complete a drug-treatment program, attend NA/AA meetings, or maintain any other support group; her inability to recognize Z.B.'s developmental-therapy needs; and her pattern of pregnancy and dependence on others for housing (instability)—as with her environmental neglect.

Appellant also challenges support for the court's grounds for termination, contending that she was found to be in compliance with the case plan and that she remained "clean" for the entire seventeen-month period. While the court did find appellant to be in substantial compliance and commended her for remaining drug free, it did not find that she was in full compliance with the case plan. In fact, it had great concern that she was not attending NA/AA meetings, as it had required, and that she had not completed a drug-treatment program. It was particularly concerned with these lapses given her admission that she struggled with urges caused by her addiction and the added stress caused by another child to be born.

Appellant does not specifically explain why the other–factors ground was not met, but the circuit court made numerous findings regarding events that occurred after Z.B. had been taken into custody that caused it concern. A significant finding was that appellant did not take Z.B. to occupational therapy when he was in her custody. She testified at the hearing that she did not believe he needed therapy and she did not intend to take him if he were returned to her. While appellant appeared to change her mind about the importance of this therapy during the course of the termination hearing, her inaction while she had Z.B. in her care was noted by the court in its order. In fact, almost all of the court's findings related to occurrences after Z.B. was removed from appellant's custody. The court properly considered the potential harm to Z.B. if it returned him to appellant. And its finding that other factors or issues arose subsequent to the filing of the original petition that demonstrated that return of Z.B. to appellant's custody was contrary to his health, safety, or welfare was not clearly erroneous.

For her second point on appeal, appellant argues that the court erred when it denied her objection to allowing DHS to recall Z.B.'s occupational therapist, Melinda Lunn. On recall, Ms. Lunn testified about Z.B.'s having come to therapy after a visit with appellant in which Z.B. appeared unclean and had a musty smell. We note first that appellant has cited no authority for her argument, and we will not research or develop an argument that has no citation to authority or convincing legal argument. *Henson v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 697, at 6. Moreover, it is the circuit court's duty to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence, Ark.

11

R. Evid. 611(a), and we will not reverse a circuit court's ruling on the admissibility of evidence absent a manifest abuse of discretion. *Hopkins v. Ark. Dep't of Human Servs.*, 79 Ark. App. 1, 7, 83 S.W.3d 418, 423 (2002). Ms. Lunn's testimony regarding Z.B.'s unclean appearance had already come in through Z.B.'s foster mother. We hold that the court did not abuse its discretion.

Although this is a unique case because the court terminated appellant's rights in spite of her ability to remain drug-free throughout the case, we are not left with a distinct and firm impression that a mistake was made. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Ford*, 2014 Ark. App. 226, at 3, 434 S.W.3d at 381. In this case, appellant did not fully comply with the case plan. Her addiction caused each of her three children to be taken into DHS custody, and she admitted that she had never completed a drug-treatment program, that she had attended NA/AA meetings for only a few months after Z.B. was born, and that she was pregnant with another child at the time of the hearing. She also admitted to continuing to have urges to use drugs. The circuit court openly struggled with its decision and credited many of appellant's positive actions, but it was convinced that it was in Z.B.'s best interest to terminate her parental rights. It made very detailed findings supporting this decision in its order, and we hold that its findings were not clearly erroneous. Accordingly, we affirm its decision.

Affirmed.

PITTMAN, WALMSLEY, and WHITEAKER, JJ., agree.

VAUGHT and HIXSON, JJ., dissent.

**LARRY D. VAUGHT, Judge, dissenting.** I would reverse this case. While it is a close case, I am left with a firm conviction that this termination is not supported by clear and convincing evidence because the statutory grounds for termination set forth in Arkansas Code Annotated section 9-27-341(b)(3)(B) (Supp. 2013) have not been met. Without such grounds, the termination is a violation of Crystal Schaible's fundamental right to parent.

Our standard of review in termination-of-parental-rights cases is well settled. When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Cobbs v. Ark. Dep't of Human Servs.*, 87 Ark. App. 188, 189 S.W.3d 487 (2004) (quoting *Johnson v. Ark. Dep't of Human Servs.*, 78 Ark. App. 112, 119, 82 S.W.3d 183, 187 (2002)). Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Chase v. Ark. Dep't of Human Servs.*, 86 Ark. App. 237, 184 S.W.3d 453 (2004) (quoting *Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 328, 42 S.W.3d 397, 403–04 (2001)). Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. *Chase*, 86 Ark. App. at 240, 184 S.W.3d at 454.

An order forever terminating parental rights must be based upon clear and convincing evidence that the termination is in the best interest of the child, taking into consideration the likelihood that the child will be adopted and the potential harm caused by continuing contact with the parent. Ark. Code Ann. § 9-27-341(b)(3)(A) (Supp. 2013). In addition to determining the best interests of the child, the court must find clear and convincing evidence

that circumstances exist that, according to the statute, justify terminating parental rights. Ark. Code Ann. § 9-27-341(b)(3)(B).

We do not terminate a person's parental rights because she is poor, has used drugs, or does not always keep a tidy house. While these examples may be factors in determining a parent's fitness, a determination of unfitness must be made before the State may proceed with a termination case. Our supreme court has recognized that a parent's right to the care and control of his or her child is a fundamental liberty and that termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Jones v. Ark. Dep't of Human Servs.*, 361 Ark. 164, 205 S.W.3d 778 (2005) (citing *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *Trout v. Ark. Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004); *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002); *Ark. Dep't of Human Servs. v. Huff*, 347 Ark. 553, 65 S.W.3d 880 (2002)). The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. *Santosky v. Kramer*, 455 U.S. 745 (1982).

In *Thompson v. Arkansas Social Services*, 282 Ark. 369, 375–76, 669 S.W.2d 878, 881 (1984) (quoting *Davis v. Smith*, 266 Ark. 112, 583 S.W.2d 37 (1979)), the supreme court stated,

> The concern of this court for the preservation of these [parental] rights has been expressed over a long period of time . . . . [W]e recognized the rights of parents of good moral character, however poor and humble they might be, if able to support their child in their own style of life, not, as a cardinal principle of law and nature, to be deprived of parental privileges, *except when urgently necessary to afford the child reasonable protection*. Parental rights and the integrity of the

family unit have always been a concern of this state and their protection regarded as a proper function of the court. They have been classified as essential rights, basic civil rights, and personal rights more precious than property rights. They have been said to be fundamental rights . . . . Certainly there remains no lingering doubt about the fact that the rights of parents to the care, custody and upbringing of their children are the subject of constitutional protection on both due process and equal protection standards.

(Emphasis added.) In light of this onerous burden, I would reverse this case.

In an order entered January 7, 2014, the court terminated Schaible's parental rights to ZD after finding that (1) she voluntarily terminated her rights to two previous children based on a drug-abuse issue; (2) she gave birth to ZD with prenatal exposure to marijuana; (3) she continued to fight drug addiction; (4) she failed to comply with a drug-addiction program or get her GED; and (5) there was a repeated pattern of behavior that clearly and convincingly showed that she had not resolved her drug issues. However, throughout the case Schaible was found to be in compliance with the case plan and court orders. In fact, the caseworker testified that she had "fulfilled most, if not all, of the things in the case plan." She did so well that she went from being "fast tracked" for termination (no services provided or early termination—less than twelve months—of services), to having unsupervised visitation and a trial home placement. She held a job, had a home, a vehicle, and a driver's license. She participated in GED classes and passed all of her drug screenings.

The trial home placement ended after an incident on a float trip (which did not involve ZD), where Schaible was arrested for public intoxication. However, she continued to have unsupervised visitation, and in fact had ZD the weekend prior to the termination. The last court report stated that "the visits go well and no major concerns have been presented after

the visits are done." The foster mother testified that when ZD was returned from visits, his feet were dirty and there was a smell of smoke on his clothing. The trial court found her to be credible and even referred to her as the "adoptive mother." There was testimony that she planned to name the child "Hunter" upon adoption. Schaible denied smoking around the child and acknowledged that ZD suffered from asthma.

At the conclusion of the hearing, the attorney ad litem summed the case up as best as anyone could:

> ZD was on trial placement with [Schaible] for about six weeks, not that long ago. If she was fit enough at that time, other than the episode with the float trip, what has happened since then to make her unfit? What I'm hearing is the question about the therapies, the smoking, and quote-unquote, bad choices . . . . When it comes down to it, Your Honor, what I have to think about is clear and convincing evidence. Is there clear and convincing evidence? I'm not so sure about that.

Here, Schaible had seventeen months of supervision but did not fail a drug screen. She was granted in-home placement and unsupervised weekend visitation. It is illogical that she can be fit enough to have her child the weekend before the termination, but then the next week there be a finding that the child would be in danger if returned to her. By all accounts she complied with the case plan and continued to make meaningful progress toward reunification. As such, I would reverse this case. The stakes are too high when a fundamental right is implicated. The court was holding the past against Schaible. And, while I do not disagree that the foster-parent situation was an arguably better environment for the child, that is irrelevant to our inquiry. The State has no interest in terminating the rights of an otherwise fit parent who presents no observable threat to the child's well-being.

I would reverse and remand.



HIXON, J., joins.

*Elizabeth J. Finocchi*, Arkansas Public Defender Commission, for appellant.

*Tabitha B. McNulty*, County Legal Operations; and *Chrestman Group, PLLC*, by: *Keith L. Chrestman*, for appellees.