
# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-16-921

JAMIE JONES

APPELLANT

V.

ARKANSAS DEPARTMENT OF HUMAN
SERVICES AND MINOR CHILD

APPELLEES

Opinion Delivered March 1, 2017

APPEAL FROM THE LONOKE
COUNTY CIRCUIT COURT
[NO. 43JV-14-36]

HONORABLE BARBARA ELMORE,
JUDGE

AFFIRMED

## LARRY D. VAUGHT, Judge

Jamie Jones appeals the April 7, 2016 order of the Lonoke County Circuit Court terminating her parental rights to her son, B.M. (born September 12, 2011). On appeal, Jones argues that the circuit court's termination order is clearly erroneous.[1] We affirm.

On February 7, 2014, the Arkansas Department of Human Services (DHS) filed a petition for ex parte emergency custody and dependency-neglect, alleging that Jones's older son, A.J., who was seventeen years old at the time, was dependent-neglected as a result of "neglect, parental unfitness and no legal caretaker." The affidavit attached to the petition alleged that on February 5, 2014, the circuit court ordered DHS to take A.J. into custody because Jones had failed to appear for her court appearance that day, leaving A.J. without an appropriate caretaker or guardian. An emergency order was entered on February 7, 2014.

---

[1]During this case, Joshua Mesoner was determined to be B.M.'s father. Mesoner's parental rights to B.M. were also terminated in the April 7, 2016 order. He is not a party to this appeal.

SLIP OPINION

On February 20, 2014, DHS filed another petition for ex parte emergency custody, alleging Jones's "neglect, parental unfitness, environmental neglect, and drug use" with respect to B.M., who was then two and half years old. The affidavit attached to this petition alleged that after the circuit court removed A.J. from Jones's custody, it ordered DHS to conduct a safety assessment on B.M. On February 18, 2014, a DHS caseworker visited Jones's residence, but Jones and B.M. were not home. Several men were there loading a U-Haul. The caseworker entered the home and observed drug needles and pipes on the floor and the couch. The caseworker called Jones and requested that she return home with B.M., but Jones refused and hung up. When the caseworker gained custody of B.M. the following day, she observed that he was in "filthy" pajamas and had a "bad odor." Jones tested positive for methamphetamine. An emergency order was entered on February 20, 2014.

At a March 18, 2014 adjudication hearing, Jones stipulated that B.M. and A.J. were dependent-neglected "based on inadequate supervision due to [her] drug use." Jones was ordered to participate in and complete parenting classes, individual and family counseling, random drug screens, residential drug treatment, a drug-and-alcohol assessment, and a forensic-psychological evaluation; obtain and maintain stable employment and housing; comply with the case plan; cooperate and maintain contact with DHS; attend visitations; demonstrate improved parenting; and remain drug free.

Review hearings were held on April 29 and August 26, 2014. The review orders from those hearings provided that return of the children to the custody of Jones was contrary to their welfare, that Jones was to comply with the case plan, that the goal of the case was reunification, and that DHS had made reasonable efforts to provide services to achieve the

goal. One of the review orders provided that Jones "is . . . doing inpatient substance[-]abuse treatment and is doing well. . . . Mom is compliant at this time." The review order provided that due to Jones's progress, she was given temporary custody of B.M. while she resided at the substance-abuse facility. At that time, Jones was also permitted a two-hour weekly visit with A.J. The order further provided that A.J. was allowed weekend visits with his aunt, Tammy Humble.

On January 2, 2015, DHS filed a motion for ex parte emergency change of custody, alleging that Jones had violated the terms of her inpatient substance-abuse-treatment program and put B.M. in imminent danger. The affidavit attached to the motion stated that on December 29, 2014, Jones, Mesoner, and B.M. joined Humble and A.J. over the holiday. Humble reported to DHS that A.J. admitted having consumed alcohol at Humble's home and that Jones and Mesoner had purchased it for him. An emergency order returning B.M. to DHS custody was entered on January 2, 2015.

Jones continued to work on the case plan. On March 10, 2015, a permanency-planning order was entered by the circuit court that provided that it was in the best interest of B.M. to return him to Jones because she was complying with the case plan and working diligently toward reunification and that termination of parental rights was not in his best interest. The court also ordered Jones to complete counseling and allowed visits with B.M. twice a week.

A fifteen-month review order was filed on June 30, 2015. The circuit court continued the goal of reunification with Jones "because the mom has been complying with the case plan and orders of this court and has made significant measurable progress toward achieving the goals established in the case plan, and the mom has been diligently working towards

reunification." On August 11, 2015, an agreed order was entered stating that Jones's hair-follicle test was negative and that it was in the best interest of B.M. and A.J. to have unsupervised visits with Jones for a minimum of two hours per week.

On September 16, 2015, a review order stated that Jones had been compliant and the goal remained reunification. This order awarded Jones a sixty-day trial placement with A.J. with several conditions, including but not limited to the following: A.J. must wear an ankle monitor at all times;[2] A.J. must attend school; and if A.J. runs away or fails to charge his monitor or cuts it off, Jones must call 911 and the caseworker.

A month later, on October 16, 2015, an agreed order was entered providing that Jones was to have one overnight visit with B.M. per week. On November 20, 2015, another agreed order was entered allowing Jones two overnight back-to-back visits with B.M. while his foster parents were out of town.

On November 24, 2015, during his trial placement with Jones, A.J. ran away from home. Jones did not immediately report this to law enforcement or DHS. He was picked up by the Garland County police on December 13, 2015. A DHS employee brought A.J. to the Lonoke County DHS Office. While waiting for his foster placement, A.J. ran away again.

On January 19, 2016, a permanency-planning hearing was held. At this hearing, the court found that B.M. and A.J. were in need of DHS services and that return to Jones's custody was not in their best interest. The court changed the goal of the case to a plan of adoption and authorized DHS to file a petition for termination of parental rights. The court further found

---

[2]While the record discloses that A.J. wore an ankle monitor and had juvenile-court issues, it does not reveal what those issues were or when they began.

that Jones had "not substantially complied" with the case plan. "She has completed some things, but has not made progress. She has completed all services, but it does not appear that the mother has changed her behavior or learned what she needed to from the services."

DHS and B.M.'s attorney ad litem filed a joint petition for termination of Jones's parental rights to B.M. on February 5, 2016.[3] After a hearing, the circuit court entered its April 7, 2016 order terminating Jones's parental rights to B.M. The court found that DHS proved, by clear and convincing evidence, that termination was in B.M.'s best interest and was supported by the failure-to-remedy and subsequent-factors grounds.

> [T]his case started with the mother abandoning her son [A.J.] at the courthouse. The mother stipulated to parental unfitness due to drug usage at the adjudication. The testimony showed that the mother completed drug treatment and has tested clean for over a year, but parental unfitness includes parenting your children. The department has offered the mother services to address her lack of parenting skills since February 2014, but the mother was just going through the motions. The Court also finds that the mother's failure to remedy her poor parenting skills is an issue that arose subsequent to the filing of the original petition for dependency-neglect because it is independent of her drug problem and was not remedied with her drug problem. Further, despite the offer of appropriate family services including three rounds of parenting classes, two rounds of counseling, and a round of intensive family services, the mother has manifested the incapacity or indifference to remedy this subsequent issue and rehabilitate this circumstance and this prevents return of the juvenile to her custody. The Court finds that the mother has not made substantial measurable progress and cannot provide a safe and appropriate home for [B.M.]. [He] has been in foster care for more than 2 years and it is not in his best interest for him to remain in care waiting for her to step up. This child needs permanency and he cannot wait any longer.

This appeal followed.[4]

---

[3]The petition did not seek to terminate Jones's parental rights to A.J.

[4]This is Jones's second attempt to appeal the April 7, 2016 order. We dismissed Jones's first attempt for lack of jurisdiction because she failed to sign her notice of appeal. *Jones v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 470, at 1–2. Thereafter, Jones signed and filed an

SLIP OPINION

Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Fenstermacher v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 88, at 7, 426 S.W.3d, 483, 487. In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile. Ark. Code Ann. § 9-27-341(b)(3)(A) (Repl. 2015). Additionally, the circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exists. Ark. Code Ann. § 9-27-341(b)(3)(B).

Termination-of-parental-rights cases are reviewed de novo. *Fenstermacher*, 2013 Ark. App. 88, at 6, 426 S.W.3d at 486. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Id.*, 426 S.W.3d at 486–87. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.*, 426 S.W.3d at 487. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* at 6–7, 426 S.W.3d at 487. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Id.* at 7, 426 S.W.3d at 487.

---

amended notice of appeal. The amended notice was untimely; however, our supreme court, in *Jones v. Arkansas Department of Human Services*, 2016 Ark. 389, at 2 (per curiam), granted Jones's counsel's motion for belated appeal.

On appeal, Jones argues that the circuit court clearly erred in finding that DHS had proved grounds supporting the termination decision. Jones argues the court erred because it was undisputed that she had completed the services that DHS requested—she completed inpatient drug treatment, overcame her drug addiction, tested negative for drugs, secured a job and an appropriate apartment, visited B.M. regularly, attended individual counseling, had a psychological evaluation, attended parenting classes, attended family counseling, completed a drug-and-alcohol assessment, and cooperated and maintained contact with DHS; therefore, she complied with the case plan. She also argues that the circuit court erred in finding that she failed to improve her parenting skills, claiming that the evidence merely showed that she had a hard time saying no to B.M., which is insufficient evidence to support grounds for termination.

The failure-to-remedy ground found at section 9-27-341(b)(3)(B)(i)*(a)* (Repl. 2015) allows for termination of parental rights if the child has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve months, and despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent. Jones only challenges the trial court's finding that she failed to remedy the conditions that caused removal.

In its oral findings, the court found that B.M. had gone into DHS custody due to Jones's parental unfitness, which included her drug use *and* her failure to parent. The court found that Jones did not make substantial, measurable progress because she failed to "do what she's supposed to do to take care of the children, which includes parenting the children." The

court said that Jones was given temporary custody of B.M., but DHS had to take him back due to Jones's poor parenting. The court gave Jones a trial placement with A.J., during which she exhibited poor parenting and ended when he ran away. The court noted that throughout the two-year case, "we've worked on parenting skills." The court said, "As a matter of fact, she's in her third round of parenting skills." The court found that "[s]he cannot parent. None of the classes has stuck." In sum, the circuit court found that despite two years of DHS's referrals and Jones's participation in and completion of many parenting-skill services, she did not achieve the intended result of making her capable of parenting A.J. or B.M.; therefore, she did not remedy the conditions that caused removal. The evidence supports this decision.

DHS caseworker Christia Jones testified that Jones had completed three parenting classes, they had been working on her parenting issues throughout the case, and she was still making poor parenting decisions. Christia Jones stated that Jones's lack of parenting skills led to the end of trial placements with B.M. and A.J. B.M.'s trial placement ended in January 2015, after DHS learned that while B.M., A.J., Jones, and Mesoner were gathered together for Christmas, A.J. had been consuming alcohol that Jones and Mesoner purchased for him. Christia Jones testified that A.J.'s trial placement ended after DHS learned that A.J. had begged Jones to drop him off in Pine Bluff for an overnight stay and to drive him to Cabot at 1:00 a.m. on another occasion, and she did, despite a court order prohibiting her from doing so. A.J. later ran away from home, and Jones did not call 911 or DHS, a condition of the trial placement. Christia Jones's concern was that Jones's parenting skills failed with A.J., and she was repeating those skills with B.M. Christia Jones added that she did not believe Jones corrected B.M. properly.

DHS caseworker Paula Harris testified that A.J. controlled and bullied Jones. Harris testified that she thought Jones was afraid of A.J. and that he threatened Jones "quite a bit." Harris stated that Jones could not control A.J. and that there was no discipline where A.J. was concerned. Harris added that Jones failed to reach out for help with A.J. despite having the knowledge and resources available to her.

Mary Ousley, DHS program assistant, testified that Jones was unable to say no to B.M. Ousley stated that, despite being told that she needed to improve that skill and provide discipline to B.M., Jones showed no improvement during the case. Ousley testified that "whatever B.M. wants to do, she lets him do it." Ousley said that "all B.M. has to do is pout, and she give[s] into it." Ousley stated that Jones said she learned in parenting class that "if it doesn't hurt [B.M.] then it's okay." Harris said that Jones similarly gave in to A.J.'s demands when she knew she was not supposed to. Ousley discussed A.J.'s demand that Jones drive him to Pine Bluff to an ex-girlfriend's house. Jones knew that was not permitted under the case plan, but she did it. Ousley discussed another incident in November 2015 when she made a home visit and A.J. was very disrespectful to and inappropriate with her. Ousley said that Jones stepped in and tried to diffuse the situation but it did not work.

In this case, Jones's actions confirm her inability to make good parenting decisions. Jones argues that her parenting mistakes regarding A.J. should not be transferred to B.M. However, a parent's past behavior is often a good indicator of future behavior. *Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 3, 434 S.W.3d 378, 381. All three DHS representatives concurred that Jones failed to discipline A.J. and that she was repeating that pattern with B.M. The DHS representatives stated that, despite years of parenting classes,

Jones's parenting skills had not improved. The circuit court credited the testimony of the DHS witnesses. It did not credit Jones's testimony that she believed she was ready to parent both A.J. and B.M., especially after she had no response when the court asked her why she had been unable to parent A.J. in the past. Credibility determinations are left to the fact-finder, here, the circuit court. *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 371.

The cases on which Jones relies are not persuasive. One is *Ivers v. Arkansas Department of Human Services*, 98 Ark. App. 57, 250 S.W.3d 279 (2007); however, it is inapplicable because the ground at issue there was involuntary parental-rights termination as to a sibling pursuant to section 9-27-341(b)(3)(B)(ix)*(a)(4)*. The second case is *Kight v. Arkansas Department of Human Services*, 87 Ark. App. 230, 189 S.W.3d 498 (2004). There, the sole reason Kight's children were removed from her custody was her drug use; there was no other evidence of parental unfitness. In fact, there was evidence that Kight's child was doing well in her care. On appeal, we reversed the termination order, holding that the circuit court clearly erred because it was undisputed that Kight had remedied her drug addiction—the sole condition that caused removal—and had complied with all other DHS requests. *Kight*, 87 Ark. App. at 238, 189 S.W.3d at 502. As set forth above, Jones's case is distinguishable. Her children were removed from her custody not only for drug usage but also because she was an unfit parent.

We acknowledge that Jones completed a large portion of her case plan. However, mere completion of the case plan does not defeat a petition to terminate parental rights. *Dozier v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 17, at 9, 372 S.W.3d 849, 854. What matters is whether completion of the case plan achieved the intended result of making a parent capable

of caring for the child. *Id.*, 372 S.W.3d at 854. Despite two years to demonstrate that she had learned to properly parent her children, two failed trial home placements, her disregard of parenting skills offered by caseworkers, classes, and counseling throughout the case, as well as her hesitation to ask for help when needed and surrounded by various service providers demonstrate Jones's inability to remedy the conditions that caused removal. Therefore, under the facts of this case, we cannot say the circuit court clearly erred in finding the failure-to-remedy ground supported the termination of Jones's parental rights to B.M.[5] We affirm on this point.

Jones next argues that the circuit court's best-interest finding must be reversed. In making a best-interest determination, the circuit court is required to consider the likelihood that the child will be adopted and the potential of harm to the child if custody is returned to a parent. *Miller v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 239, at 7, 492 S.W.3d 113, 117; Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). Section 9-27-341(b)(3)(A) provides that the circuit court is required to consider only the potential harm to the health and safety of a child that might result from continued contact with the parents. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, at 12, 314 S.W.3d 722, 728. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id.*, 314 S.W.3d at 728. Furthermore, the supreme court has directed that the potential-harm analysis be conducted in broad terms. *Id.*, 314 S.W.3d at 728 (citing *Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397

---

[5]Because only one ground is required to support termination of parental rights, we do not address the circuit court's finding that termination was supported by the subsequent-factors ground. *Fenstermacher*, 2013 Ark. App. 88, at 7, 426 S.W.3d at 487.

(2001)). Finally, the court's potential-harm inquiry is but one of the many factors that a court may consider in a best-interest analysis. *Id.*, 314 S.W.3d at 728.

Jones does not challenge the circuit court's adoptability finding. She does, however, challenge the circuit court's potential-harm finding. She argues that while she "may not be the 'perfect' mother, she certainly poses no danger, of any kind, to the health and safety of the son she loves so much and who is so 'incredibly bonded to his mom.'" She contends that "not a single DHS witness expressed a reason why returning the child to the mother would affect the child's health and safety." We disagree.

Three DHS witnesses testified that Jones would not discipline B.M. or tell him no. They testified that this was a repetition of the same failure with A.J. The DHS witnesses testified that Jones did not parent A.J., she did not discipline him, and she could not control him. The DHS witnesses testified that, despite the services Jones received in this case, she was still unable to parent A.J. She admitted giving in to his demands in violation of court orders. She purchased alcohol for him while he was underage, and he consumed it while under the same roof as Jones and B.M. He refused to attend school. He ran away from home. Jones's failure to parent A.J. has threatened his safety and well-being. The circuit court properly considered evidence of Jones's parenting of A.J. in analyzing the potential harm to B.M. Past behavior is correctly viewed as a predictor of potential harm that may likely result if a child is returned to the parent's custody. *Helvey v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 418, at 10, 501 S.W.3d 398, 404.

Another factor considered by the circuit court in its best-interest analysis was the two years that B.M. had spent in foster care. The circuit court found that it was not in B.M.'s "best

interest . . . to remain in care waiting for [Jones] to step up. This child needs permanency and he cannot wait any longer." Further delay would go against the clear legislative intent of the TPR statute, which is to provide permanency in a time frame consistent with the child's development, not the parent's. *Linker-Flores v. Ark. Dep't of Human Servs.*, 364 Ark. 224, 235, 217 S.W.3d 107, 116 (2005); *see* Ark. Code Ann. § 9-27-341(a)(3). Living in continued uncertainty is, itself, potentially harmful to children. *Bearden*, 344 Ark. at 331, 42 S.W.3d at 405. Accordingly, we hold that the circuit court did not clearly err in finding that termination of Jones's parental rights was in B.M.'s best interest. We affirm.

Affirmed.

WHITEAKER and MURPHY, JJ., agree.

*Ogles Law Firm, P.A.*, by: *John Ogles*, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.