Cite as 2024 Ark. App. 276

# ARKANSAS COURT OF APPEALS
### DIVISION IV
#### No. CV-23-846

|  |  |
|---|---|
| ILDIFONSO GARZA AND SHANA HEMBREY<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered April 24, 2024<br><br>APPEAL FROM THE JACKSON COUNTY CIRCUIT COURT [NO. 34JV-21-131]<br><br>HONORABLE ADAM G. WEEKS, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

Ildifonso Garza and Shana Hembrey each separately appeal the Jackson County Circuit Court's order terminating their parental rights to their daughter, MC. Neither party challenges the statutory grounds for the termination; instead, they both argue that the circuit court erred in finding that termination was in MC's best interest. We affirm.

On October 2, 2021, the Arkansas Department of Human Services (DHS) received a Garrett's Law report that MC had tested positive for amphetamine at birth. When questioned by the family service worker, Hembrey admitted using methamphetamine the weekend prior, and her drug screen came back positive for methamphetamine and opioids. Garza was present at the hospital but refused to submit to a drug screen. Hembrey informed DHS that she did not want Garza involved and did not intend to place his name on the birth

certificate. Garza then left the hospital. As a result of their investigation, DHS placed a seventy-two-hour hold on MC.

On October 6, DHS attempted to contact Hembrey to assess her home. When DHS family service workers (FSWs) arrived at the address Hembrey had provided at removal, they were told that Hembrey did not live at that address but lived with her grandparents. When the workers went to the grandparents' home, they found it to be clean and tidy except for Hembrey's room, which was in disarray. The only baby item in the home was a highchair. There was no crib, bassinet, or clothing present. Hembrey was not present during the visit but agreed to travel to the DHS office for a meeting later that day. While there, she submitted to another drug screen, which revealed she was positive for methamphetamine, amphetamine, and opioids. She then admitted using controlled substances upon her release from the hospital. As a result, DHS exercised another seventy-two-hour hold on the child.[1]

On October 7, DHS filed a petition for emergency custody and dependency-neglect naming Hembrey as a parent and identifying Garza as a putative parent. The affidavit in support of the petition set out the foregoing facts and stated that removal was necessary because Hembrey's substance abuse seriously affected her ability to supervise, protect, or care for the child. The ex parte order for emergency custody was granted that same day.

In an October 13 order, the circuit court found that probable cause existed and continued to exist and that it was in the best interest of MC to remain in DHS custody. The

---

[1]This second seventy-two-hour hold was necessitated by DHS's failure to submit a timely ex parte order for emergency custody when the child was first removed.

court further found that DHS had been involved with the family since December 2010 but that the services had not prevented removal because Hembrey had given birth to MC, who tested positive for methamphetamine. Hembrey attended the probable-cause hearing; Garza did not.

In a December 2 order, the circuit court adjudicated MC dependent-neglected due to parental unfitness caused by Hembrey's drug usage. Garza failed to appear at the hearing, and the circuit court ultimately dismissed him from the action, finding that he had not established significant contacts with MC and that his rights as a putative parent had not attached. The court set a goal of reunification and ordered Hembrey to comply with the approved case plan.

In January 2022, Hembrey, who had been placed on probation for crimes committed in July 2019,[2] had her probation revoked. Upon revocation, she was sentenced to a total of thirty-six years in the Arkansas Department of Correction.

In March and August 2022, the circuit court entered review orders continuing the goal of reunification and finding that safety concerns prevented a trial placement with, or return of custody to, Hembrey because of her continued incarceration.

A permanency-planning hearing was held on November 1, 2022. After the hearing, the court changed the goal of the case to adoption. The court found that Hembrey had not

_____

[2]Hembrey was on probation for two counts of financial identity fraud and one count of theft of property (credit/debit card). She received fifteen years on each of the fraud counts and six years on the theft count, to run consecutively.

complied with the case plan and orders of the court; had not demonstrated progress towards the goal of the case plan; and was not working to remedy the issues that prevent the safe return of the juvenile. Specifically, the court noted that Hembrey remained incarcerated.

Shortly thereafter, on November 14, 2022, DHS filed a petition for termination of parental rights asserting multiple statutory grounds against Hembrey—twelve-month failure to remedy, subsequent other factors, aggravated circumstances, and incarceration.

On April 14, 2023, Garza signed an acknowledgment of paternity. On the same date, stating its intent to file an updated petition, DHS moved to dismiss its termination petition, which the court granted. Subsequently, Garza was recognized as a parent, was again added as a party, and was appointed counsel.

On June 26, 2023, DHS filed another petition to terminate parental rights. As to Hembrey, the petition again alleged twelve-month-failure-to-remedy, subsequent-other-factors, aggravated-circumstances, and incarceration grounds. As to Garza, it alleged the following grounds to support termination: noncustodial parent twelve-month failure to remedy, twelve-month failure to provide significant material support or maintain meaningful contact, subsequent other factors, aggravated circumstances, abandonment, and incarceration.

A termination hearing took place on September 26. Garza and Hembrey testified, as did Natalie Hohn (the FSW), April Stokes (the FSW supervisor), and Hannah Briggs (the foster parent).

4

Garza testified that he believed MC to be his daughter, that he was present at the hospital when she was born, and that he was aware that she was placed in foster care shortly after birth. He admitted that he had refused the drug screen requested by DHS at the hospital but claimed he would have tested negative for illegal substances. He stated that he waited almost a year and a half to contact DHS because DHS told him it could not help him and that he would need a lawyer. He further explained that his father had died, and because he was absconding, he was afraid he would go to prison. He further admitted that his probation had been revoked and that he was serving a five-year sentence he had received for credit-card fraud. However, he claimed that he would not serve the entire five-year sentence and was set to be released on December 12.[3] He also admitted that at the time of his arrest, he was found in possession of methamphetamine and was convicted of that charge as well.

Garza then testified that he had engaged in Zoom visits with MC after he had signed the acknowledgement of paternity and that they had gone pretty well. However, he had not had any face-to-face contact with MC for almost eleven months.[4] When asked, he admitted he had not paid any child support for MC but asserted that the court had never ordered him to pay any support for her either. He further noted that he had been paying child support for his other two children who lived with their mother. He stated he had taken parenting,

---

[3]He claimed his release date was set because he had been sentenced to judicial transfer to ACC.

[4]He testified that he saw MC five or six times during the time MC was placed with Hembrey's sister.

fatherhood, and money-management classes and intended to get his GED. He also claimed to own a home—the one in which he was arrested and found with methamphetamine—but acknowledged it was not suitable for MC.

As for his plans to parent MC, he stated he hoped to leave the county, get another house, and get a job at the steel mill in Osceola when he was released from prison. He believed he would be able to achieve his goals within three or four months after his release. Even though MC had spent her entire two years of life in foster care, he denied abandoning her and asked for more time and a chance to parent her.

Hembrey testified next and confirmed that she had been sentenced to thirty-six years in prison, was presently incarcerated, and had been incarcerated since October 24, 2021. She noted that she was four years and two months away from her release date. She claimed that she had participated in multiple programs while in prison, including parenting classes, and that she had enrolled in college courses in pursuit of a business degree.

As for visitation with MC, she claimed that she had been allowed Zoom visits with her and had attended them all. She admitted that the only in-person contact with MC occurred during the three weeks after MC's birth and before Hembrey's arrest. She acknowledged that for a period of almost one year thereafter, visitation did not occur because MC was staying with her sister, who was not on Hembrey's approved visitor list at the jail. Hembrey argued that she would have bonded with MC during that time if she had been provided visitation.

As for her substance-abuse issues, Hembrey acknowledged she has a drug problem and had failed two drug screens but asserted that her drug issue was currently under control. She asserted that she had received a certificate for completing a substance-use rehabilitation class and had not had a positive drug screen for ten months. She complained that DHS had not provided her with any services other than Zoom visitation since her incarceration.

As for MC's care, Hembrey asked that her parental rights not be terminated and that Garza be given the opportunity to parent MC. She explained that she had not placed Garza on MC's birth certificate initially because they were not on good terms at that point. She also listed several relatives that she believed could take custody of MC. She indicated that she did not believe it would be hard on MC to be moved from her current placement because she was too young for lasting memories and would adjust to being home with her family. She stated that, once she was released, she planned to leave the county, finish her degree, and get a job elsewhere.

Natalie Hohn, the FSW assigned to the case, was the next to testify. She recommended that parental rights be terminated so DHS could move forward with plans for MC's adoption. She stated that MC had been in care for the entirety of her life—almost two years—and that MC could still not be placed with either parent due to their incarceration. She noted that Hembrey had been sentenced to thirty-six years in prison and Garza five, although Garza was set to be released on December 12. Because of their incarceration, the only services DHS could provide were Zoom visits, updated case plans, and pictures. She

7

testified that MC is a healthy child; she was unaware of any obstacles to her adoption; and that it was in MC's best interest to move forward with termination.

As for Garza, she testified that he was initially only considered a putative father and that he had not appeared at the first two hearings. She stated that she spoke to him only once on the telephone, on October 6, and that he was supposed to meet with her at the office, but he did not show. She stated he had had no contact with DHS until shortly before the acknowledgment of paternity was filed. Once he established paternity, a case plan was developed. She stated that he was able to access parenting classes through the ADC, but they had been unable to perform drug screens.

April Stokes, the FSW supervisor assigned to the case since its inception, testified that she also agreed with the recommendation that Garza and Hembrey's parental rights be terminated and that termination was in MC's best interest. Additionally, she testified that she was unaware of any issues that would prolong or prevent MC from being adopted.

Stokes then testified to potential relative placements investigated by DHS. She stated that MC was initially placed with Hembrey's sister, Janice Williams, after removal. MC was in that placement for almost a year but ultimately had to be removed because of reports of Williams's irrational behavior and drug use. Stokes stated that DHS had been provided with nine other potential relative-placement options; that one of the potential placements was still under review and had yet to be denied; but that there were concerns with the rest. She then described in detail the concerns DHS had with each of the nine prospective placement options.

The last witness to testify at the hearing was the foster mother, Hannah Briggs. She testified that MC is her foster daughter and had been placed in her home for over a year. She stated that MC had bonded with and become very attached to her adopted daughter while living there.

At the conclusion of the hearing, the circuit court terminated the parental rights of both Hembrey and Garza. It terminated Hembrey's parental rights on the grounds of failure to remedy, incarceration, and aggravated circumstances—little likelihood for successful reunification. It terminated Garza's parental rights on the grounds of incarceration, subsequent other factors, and aggravated circumstances—little likelihood for successful reunification. As to both parents, it found that termination was in the MC's best interest. Specifically, the court found that both parents were incarcerated, and neither had a safe and appropriate home for MC.

Both Hembrey and Garza have now appealed the circuit court's termination of their parental rights. We review termination-of-parental-rights cases de novo. *Heath v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 255, 576 S.W.3d 86. We review for clear error, and a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* A court may order termination of parental rights if it finds clear and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2023), and that termination is in the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety

9

of the child that would be caused by returning him or her to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

On appeal, Garza and Hembrey assert only that the termination of their parental rights was not in MC's best interest, and as to best interest, they challenge only the potential-harm prong of the best-interest finding. In assessing the potential-harm factor, the circuit court is not required to find that actual harm would result or to identify specific potential harm. *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, 555 S.W.3d 915. Potential harm must be viewed in a forward-looking manner and in broad terms, but a court may consider a parent's past behavior as a predictor of future behavior. *Id.* at 12, 555 S.W.3d at 921.

As to his claim of error, Garza challenges the court's determination that MC could not be returned to the family home within a "reasonable period of time as viewed from the child's perspective." He notes that MC is only two years old and that an additional three months is an insignificant amount of time when compared to the next sixteen years of being forever separated from her father. He claims that he is making progress; that he is only months from being released from prison; that MC is currently in a stable placement; that there is still one more relative placement being explored by DHS; and that the age of the case is the only factor supporting termination. He argues that when a parent demonstrates stability and a reasonable hope for reunification, there is no harm in waiting a little longer before terminating parental rights. Because there is reasonable hope for him to be able to parent MC, he claims the termination decision should be reversed.

10

However, sufficient evidence supports the court's best-interest finding as to Garza because Garza has not demonstrated stability and a reasonable hope for reunification. He is currently incarcerated, and although his potential release date was only a few months away at the time of the hearing, he admitted he had not yet secured employment or suitable housing upon his release. This court has affirmed a potential-harm finding based on incarceration because the lack of stable housing and employment due to incarceration are sufficient to prove potential harm. *See, e.g.*, *Martin v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 508, at 10, 657 S.W.3d 881, 887 (citing *Brumley v. Ark. Dep't of Hum. Servs.*, 2015 Ark. 356, at 10–12). Moreover, while he allegedly visited MC five or six times prior to his incarceration and by Zoom thereafter, there was no evidence as to what type of a bond, if any, he had with MC. He failed to even acknowledge his paternity for more than a year after her birth because he chose to abscond rather than fulfill his parental obligations. And while he points to the fact that he has other children whom he supports financially, those children live with their mother, and there is no evidence that he has any bond with those children or that MC has forged any bonds with them. There was also evidence introduced at the hearing that he refused a drug screen at the hospital after MC's birth and that he was found to be in possession of a controlled substance when he was subsequently arrested. Thus, it is unclear the extent of his substance-abuse issues, if any.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be

11

accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Schaible v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 371. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Id.*, 444 S.W.3d at 371. Simply put, there was insufficient evidence to support Garza's claim that he would be able to begin parenting MC upon his release from prison, and there was sufficient evidence upon which to support the court's determination that termination was in her best interest.

Hembrey, in her brief, argues that termination was not appropriate because relative placement was a less restrictive alternative to termination. She claims that DHS only paid lip service to the search for relative placement and simply denied some of the potential relative placements without properly determining whether those relatives would actually qualify as a placement option. She identified three potential relative placements: Alberto Garza (Garza's brother); Jasmine Hernandez (Garza's cousin); and Davina Hembrey (her stepmother).

As stated above, Stokes, the FSW supervisor, testified in detail the concerns DHS had with the potential placement options suggested by Hembrey. She testified that that Alberto was denied because he lived in a home that was admittedly unsuitable. Jasmine was denied because she lived in her boyfriend's home along with him and his mother; that her boyfriend was the only one in the household with a valid driver's license; and that her boyfriend had tested positive for THC despite not having a medical marijuana prescription. Additionally,

12

Jasmine indicated that if her boyfriend had known he was going to be drug tested, he would have been prepared—in other words, he would have hidden his illegal drug use. As for Davina, Stokes testified that she had not been forthcoming and truthful with DHS. Davina informed DHS that she was separated from Hembrey's father; however, her social media posts suggested otherwise. She also told DHS that, despite their separation, she did not intend to divorce him. This is important because Hembrey's father was on active parole, and it is DHS policy that persons on active parole cannot be provisional foster parents.

In order to make a least-restrictive-placement argument on appeal, at a minimum, there must be an appropriate and approved relative in the picture. We have held that where relatives have not been approved for placement and the children remained in foster care, the existence of potential relatives was not a basis to reverse a termination decision. *Thomas v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 457, 610 S.W.3d 688; *Dominguez v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 2, 592 S.W.3d 723. Because there were no approved relative-placement options available at the time of the termination hearing, and because there was no reasonable hope for reunification within a reasonable time frame from MC's perspective, the court's termination decision as to Hembrey was not in error.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Dusti Standridge*, for separate appellant Ildifonso Garza.

*James & Streit*, by: *Jonathan R. Streit*, for separate appellant Shana "Hembrey.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.